UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

BRIAN SMITH,

                        Petitioner,

                                                REPORT, RECOMMENDATION
                                                and ORDER
            -v-                                 1:18-CV-00883 – JLS-MJR

JOSEPH NOETH, Superintendent, Attica
Correctional Facility,

                        Respondent.

---

## INTRODUCTION

Brian Smith ("Petitioner") has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Dkt. No. 1). He challenges the constitutionality of the November 2, 2007 judgment entered in Monroe County Court, New York, following a jury verdict convicting him of first-degree manslaughter (New York Penal Law ("P.L.") § 125.15) and second-degree criminal possession of a weapon (P.L. § 265.03). For the reasons discussed below, the Court recommends dismissing the petition.

## BACKGROUND

I.      **The Crime, the Indictment, and Pre-Trial Matters**

Petitioner's conviction stems from the shooting death of Triston "Munch" Harris ("Harris") on October 2, 2005, outside a convenience store at the corner of Clifford Avenue and Miller Street in the City of Rochester, New York. Although the store's surveillance cameras captured the shooting on videotape, the Rochester Police Department ("RPD") made no arrests at the time. In fact, the RPD initially suspected that the shooter was

1

Petitioner's associate, Danny Gayden ("Gayden"). But after Gayden spoke to police in January of 2006, the focus of the RPD's investigation turned to Petitioner.

On December 12, 2006, a Monroe County grand jury indicted Petitioner in connection with Harris's death, charging him with second-degree (intentional) murder (P.L. § 125.25(1)) and second-degree criminal possession of a weapon (P.L. § 265.03). At Petitioner's arraignment on March 1, 2007, the Monroe County Court (Connell, J.) (the "trial court") granted the prosecution's request to unseal the indictment. (*See* 3/01/07 Transcript ("Tr.") (Dkt. No. 33-3) at 2-3).

Defense counsel filed a motion to suppress the identifications made by five witnesses as the product of unduly suggestive photographic arrays, and the trial court ordered a hearing pursuant *United States v. Wade*, 388 U.S. 218 (1967). (*See* 5/17/07 Tr. (Dkt. No. 33-3) at 2).[1] (6/21/07 Tr. (Dkt. No. 33-3) at 3). On June 21, 2007, RPD Investigator James May ("Investigator May") testified that on various dates in January and March of 2006, he conducted identification procedures with Witness Numbers 2, 3, and 4 (6/21/07 Tr. at 8-9, 12-16, 23-27) and with Monroe County Jail employee Corporal Jason Tripoli (*id.* at 17-21). Corporal Tripoli and the three civilian witnesses positively identified Petitioner from the photographic arrays they viewed. (*Id.* at 9, 15, 21, 27). Witness

---

[1] The hearing commenced on June 4, 2007, but that transcript is not in the volume of transcripts (Dkt. No. 33-3) submitted by Respondent. Prior to the first hearing date, the prosecutor obtained an *ex parte* protective order due to concerns about the witnesses' safety. (*See* 6/21/07 Tr. (Dkt. No. 33-3) at 45-46). Accordingly, the parties referred to the four civilian witnesses as Witness Numbers 2, 3, 4, and 5 instead of by name. It appears, based on the prosecutor's statements at the continuation of the hearing on June 21, 2007, that RPD Sergeant Mark Mariano ("Sergeant Mariano") was the only witness on June 4, 2007, and he testified that he conducted a photo array with Witness Number 5. There is, however, no other information in the transcripts about that identification procedure. A week prior to trial, the prosecutor provided to defense counsel unredacted copies of all the identification witnesses' depositions and other discovery material. (See 9/04/07 Tr. (Dkt. No. 33-3) at 2-5). Again, this information is not in the state court records provided by Respondent.

Number 2 said, "he's the one that said he shot the guy at Clifford and Miller." (*Id.* at 9).

Witness Number 3 stated, "That's 'B' . . . 'the one on the bike on the sidewalk shooting. . . . He rode right past me and almost shot me.'" (*Id.* at 15). Witness Number 4 pointed to Petitioner's photo and said, "[T]hat's 'B' right there. . . . He did the dude . . . [at] . . . Clifford and Miller.'" (*Id.* at 27).

On cross-examination, defense counsel elicited from Investigator May that Witness Number 3 had identified someone else as the shooter at a photo array conducted three days after the shooting. (*See id.* at 37-45, 47-48, 50-51). Witness Number 3 told Investigator May that she had not been completely truthful during the first photo array because she was afraid of retaliation from members a gang that sold drugs out of a house in the area of the shooting. (*Id.* at 54-55, 70-71). Defense counsel elicited from Witness Number 3 that Gayden was one of the gang members. (*Id.* at 72). The *Wade* hearing concluded on June 21, 2007.[2]

On September 10, 2007, prior to jury selection, the trial court held a *Sandovall Molineux* hearing[3] concerning the prosecution's request to offer (1) evidence regarding Petitioner's prior convictions involving stolen property, drug-possession, and armed robbery; and (2) testimony from Danny Gayden that he and Petitioner, prior to the

---

[2] The trial court's disposition on Petitioner's motion to suppress is not in the record. Presumably, it was denied.

[3] A "*Sandovall/Molineux* hearing" is a short-hand reference to the procedure used by New York State courts to make an advance ruling as to whether a testifying defendant's prior crimes are admissible for impeachment purposes, *see People v. Sandoval*, 34 N.Y.2d 371, 376-77 (1974); and whether a defendant's prior crimes or uncharged criminal conduct is probative for the purpose of showing, e.g., motive, intent, absence of mistake or accident, common scheme or plan, or identity; and whether the probative value of that evidence outweighs its prejudicial effect, *see People v. Molineux*, 168 N.Y. 264, 293-94 (1901).

shooting, had both fired the gun used to shoot Harris at a futon in the basement of Gayden's drug house on Clifford Avenue. (Trial Transcript ("TT") (Dkt. 33-3): 7-11).

The trial court partially granted the prosecution's *Sandoval* application, ruling that if Petitioner testified, the prosecutor could cross-examine him about the conviction for possession of stolen property. (TT: 11-12). However, with regard to the drug-possession and robbery convictions, the trial court restricted the prosecutor to simply asking Petitioner if he had been convicted of a felony. (TT: 12-13).

As far as Gayden's proposed testimony about Petitioner firing the alleged murder weapon at the futon, defense counsel argued that it should not be admitted under *Molineux* because it was unreliable and uncorroborated. (TT: 8). After the prosecutor explained that he anticipated presenting ballistics evidence linking the gun used in the futon incident with the Harris shooting (TT: 9-10), the trial court granted the *Molineux* application as to Gayden's testimony. (TT: 14).

## II.     The Trial Evidence

### A.     The Prosecution's Case

Gayden and Petitioner, or "B." as he was known, had been friends for about five years and saw each other every day. (TT: 206-07). A week or two before the night of October 1, 2005, Gayden saw Petitioner with a .380-caliber handgun at 1336 Clifford Avenue, a house out of which Gayden sold drugs. (TT: 245-47). Petitioner told Gayden that he bought the gun from a crack addict. (TT: 247). Gayden admitted that both he and Petitioner fired the gun into a futon mattress in the basement of 1336 Clifford Avenue to see if the gun worked. (TT. 247-49).

On October 1, 2005, at about 11 p.m., Gayden was walking to a house party on Hollister Street with his cousin, Alphonso Snow ("Snow"), and someone named "BB" (a different individual than Petitioner, a/k/a "B."). (TT: 207-08). A maroon car pulled up closely next to Gayden, Snow, and BB, almost hitting them. (TT: 209, 269-70). The car's occupants started yelling at them and then jumped out and started chasing them. (TT: 209, 270-73).

Pursued by several of the car's occupants, Gayden and Snow ran into a cell phone store on Portland Avenue. (TT: 209-10). One of the men from the maroon car started shooting a gun during the chase. (TT: 273-74). Just as Gayden was running into the store, he heard someone say, "yo, that's the shooter right there," pointing at Gayden. (TT: 282). Gayden said, "no, it is not me," and "lift[ed] up [his] shirt." (TT: 281-82). Then a fight erupted and somebody hit Gayden on the head with a forty-ounce bottle of beer. (TT: 210-11, 282-83).

Gayden and the rest the crowd dispersed when the store owner yelled that he had called the police. (TT: 210, 283). Gayden and Snow got a ride with BB, who was pulled over by police responding to a report of "shots fired" in the area. (TT: 211, 278). The police searched them and let them go on their way. (T: 212). Gayden eventually ended up back at his drug house on Clifford Avenue. (TT: 212-13, 265).

Later that night, Petitioner stopped by the Clifford Avenue drug house and asked Gayden what had happened to his face. (TT: 213). When Gayden told Petitioner someone had hit him with a bottle, Petitioner became angry and demanded to know "[w]ho the fuck did this?" (TT: 213-14). Petitioner kept "going on about what happened" and "was like, man, fuck that, man." (TT: 214).

Later that night, Gayden and Petitioner rode their bikes to the store located at the corner of Clifford Avenue and Miller Street to buy beer. (TT: 214-15). Gayden spotted the maroon car from earlier that night parked in front of the store on Clifford Avenue, but there was nobody in it. (TT: 215-16). Scanning the small crowd outside the store, Gayden saw a man (Harris) using a pay phone about ten feet away from the maroon car. (TT: 216-17). He told Petitioner that the maroon car looked like the one from the fight that occurred earlier (TT: 216) and that the person using the pay phone "looks like one of the dudes [from the fight] right there." (TT: 216-17).

After Gayden made that observation, Harris started running towards the maroon car. (TT: 217). Gayden testified that Petitioner "just rood up and started shooting" at the car. (TT: 218, 220). Specifically, Gayden said, Petitioner had ridden up near the entrance of the corner store but he turned his bike around and rode towards Harris, who was running behind the maroon car. (TT: 293-94). As Harris was getting into the driver's seat of the maroon car (TT: 218-19), Petitioner stopped his bike on the sidewalk but did not get off it, pointed his gun at the car, and started shooting. (TT: 219, 293-94). Gayden said that Petitioner was using the same .380-caliber automatic handgun he had bought from the crack addict, and he fired more than two shots in Harris's direction. (TT: 219, 245-48). During the shooting, Gayden remained on his bike in the street behind the maroon car. (TT: 220, 234, 290).

The prosecutor showed Gayden still photographs taken from the surveillance videotape outside the store. Gayden testified that they depicted the scene of the shooting. (TT: 236-38, 242-43). He identified where he, Petitioner, and Harris were located in the

photographs based on his recollection, though he admitted he could not discern anyone's facial features. (TT: 239-41).

Gayden testified that after the shooting Petitioner rode his bike to 1550 Clifford Avenue. (TT: 220-21). Gayden went back to 1336 Clifford Avenue. (TT: 221, 223, 294). Later that night, Gayden met up with Petitioner and Snow over at 45 Kohlman Street (TT: 223, 294), the residence of Octavia Allen ("Allen"), Gayden's girlfriend and the mother of his young child. (T: 223). Allen testified that while Gayden and Snow were recounting how they had had gotten into a fight earlier in the evening, Petitioner did not say anything and was "just staring." (TT: 379-81). Gayden testified that he did not mention the shooting at first but after Petitioner left, he eventually told Allen, "I got in a fight and B, uhm, shot the dude who was at the fight." (TT: 224).

Around 10 a.m. or 11 a.m. on October 2, 2005, Petitioner called Gayden and said he was coming over to talk to him. (TT: 224). When Petitioner arrived at Allen's apartment a short while later, Allen asked him if he was all right. Petitioner replied that "he made a mistake last night; that he didn't mean to shoot the boy." (TT: 382-83). Petitioner told Allen that "he was going to get out of town before somebody told on him." (TT: 383, 415). Petitioner spoke separately to Gayden, who asked what he did with the gun. (TT: 224). Petitioner said he wrapped it in a sock and threw it in the river. (TT: 224-25). Petitioner also told Gayden he was going to get out of town and needed money. (TT: 226).

On the night of October 2, 2005, Gayden and Petitioner were together at the apartment complex where Gayden lived. They were smoking, drinking, and rapping. (TT: 226-27). Gayden testified that Petitioner rapped that "he was a killer, and [he] did it on Miller." (TT: 227). Allen testified that Petitioner and Snow approached her that night at the

7

same apartment complex and asked if she knew anything about what happened the previous night. (TT: 384). When Allen replied "no," Petitioner started to laugh. (TT: 384-85, 386). Petitioner then told Allen that he "shot the boy," that his "cool points went way up," and that he was going to get on a train to Atlanta that night. (TT: 385-86).

At some point before the night of October 3, 2005, Gayden told Petitioner he had noticed a surveillance camera outside the corner store. (TT: 316). At Petitioner's suggestion, Gayden and Snow accompanied him to the corner store on the night of October 3, 2005, so he could retrieve it. (TT: 227-28, 316-17). Gayden saw Petitioner go inside and talk to the store employees but did not see him obtain the videotape. (TT: 229). Gayden testified that when Petitioner left the store, he kicked over a collection of teddy bears and candles that had been set up on the sidewalk as a memorial to Harris, and then spat and urinated on the memorial. (TT: 230-31, 318).

About a week later, on October 8, 2005, members of the RPD arrested Gayden, Petitioner, and Snow in connection with an unrelated armed robbery.[4] (TT: 243-44). While they were in the booking area of the Monroe County Jail, Gayden told Petitioner that the police had the surveillance videotape and had sent an investigator to see him. (TT: 244). Petitioner responded that he was going to "own up to it." (*Id.*).

---

[4] Gayden admitted that he resolved the October 2005 robbery charge by pleading guilty to attempted second-degree robbery in March of 2006. (TT: 205-06, 331). In exchange for Gayden testifying truthfully at Petitioner's trial, the prosecution promised Gayden a sentence of six months in the Monroe County Jail plus five years' probation. (TT: 205-06, 330). The prosecutor also said that he would not charge Gayden in connection with the Harris shooting. (TT: 334). Gayden also admitted that in December of 2006, he had been arrested by federal authorities for possessing crack cocaine and a stolen firearm. (TT: 337-38). At the time of Petitioner's trial, he had resolved the federal court charges by pleading guilty to possessing a weapon with intent to further a drug conspiracy and possessing crack cocaine with the intent to distribute (TT: 339). In exchange for giving truthful testimony in Petitioner's case, the state prosecutor agreed to recommend to federal authorities that Gayden's state and federal sentences run concurrently. (TT: 206-07, 340).

Gayden testified that once he realized he was a suspect in the Harris shooting, he decided to meet with the police to clear his name. (TT: 245). In January of 2006, he and his attorney met with members of the RPD and Gayden told them what he had seen. (TT: 244-45, 328-30). Gayden also told the police that a couple of weeks before the shooting, he had seen Petitioner fire the .380-caliber handgun at a futon located in the basement of 1336 Clifford Avenue. (TT: 247-48). Gayden called Allen from the meeting and directed her to talk to the police about the Harris shooting. (TT: 418-19).

Scott LaPoint, M.D. ("Dr. LaPoint"), the Monroe County Medical Examiner, conducted the autopsy on Harris. (TT: 430). Dr. LaPoint testified that Harris had sustained two gunshot wounds on the right side of his back, one near the shoulder and one lower down. (TT: 431-33, 435). Dr. LaPoint removed two bullets from the front side of Harris's left chest. (TT: 434). The bullets had traveled through the right lung, and one had passed through the edge of the heart. (TT: 435-36). The gunshot wounds caused internal bleeding, which in turn caused Harris's death. (TT: 437-38).

Steven Rice ("Rice"), an evidence technician with the RPD, found that Harris's vehicle, a 1997 maroon Mercury Sable, had a broken passenger's-side rear window and a bullet hole in the passenger's-side rear door. (TT: 454-56). Evidence technician Richard Martin ("Martin") collected a projectile from the door of the Mercury Sable. (TT: 495). On the sidewalk and the roadway underneath the car, Martin observed five spent .380-caliber casings and one live .380-caliber bullet. (TT: 458). He also collected a VHS tape from the store's surveillance cameras. (TT: 466-67).

David Williams ("William"), an evidence technician with the RPD, analyzed the VHS tape. (TT: 479-80). After making a digital copy of the tape, he extracted five video

clips showing the view from the different surveillance cameras at the time of the shooting. (TT: 480-81, 483-84). The jury viewed those video clips. (TT: 483, 486).[5]

Investigator May executed a search warrant at Gayden's drug house at 1336 Clifford Avenue on January 27, 2006. (TT: 501-02). He and evidence technician Mark Walker ("Walker") found a projectile inside a futon mattress in the basement. (TT: 503-04, 509-10). Walker also found a .380-caliber casing inside a cabinet next to the futon. (TT: 509-10).

John Clark ("Clark"), a firearms examiner for Monroe County, analyzed the ballistics evidence. (TT: 522-35). He testified that, to a reasonable degree of scientific certainty, the projectiles recovered from the crime scene, Harris's body, and 1336 Clifford Avenue all were fired by the same semi-automatic .380-caliber pistol. (TT: 536).

On August 23, 2006, Sergeant Mariano and RPD Investigator Glenn Weather visited Petitioner, who was in state custody on an unrelated offense. (TT: 547-49). Petitioner waived his rights and agreed to speak with them about Harris. (TT: 549-50). Petitioner denied any involvement in the shooting and said he had not been on Clifford Avenue on October 2, 2005. (TT: 553). Petitioner viewed a DVD of the corner store's surveillance camera footage and admitted to the officers he is left-handed. (TT: 553-54).

Petitioner said he knew of Harris but did not know he was dead and had nothing to do with his death. (TT: 554). At that point, Sergeant Mariano read aloud from the witnesses' depositions concerning the shooting. (*Id.*). Petitioner continued to deny his

---

[5] The DVD of the surveillance camera footage shown to the jury is not part of the state court records submitted by Respondent. There is no dispute that the video footage showed a man on a bicycle using his left hand to fire a gun in the direction of Harris's car. (*See, e.g.*, State Court Record ("SR"): 370 (Petitioner's Counseled Appellate Brief)). Gayden testified that he is right-handed. (TT: 215). Corporal Jason Tripoli, an employee at the Monroe County Jail, identified Petitioner in court and testified that on January 12, 2006, he observed Petitioner sign a document with his left hand at the Monroe County Jail. (TT: 449-51).

involvement and began "sucking his teeth and shaking his head." (TT: 554-55). When Sergeant Mariano told Petitioner that they knew he had asked the store owners for the surveillance camera videotape and had "kicked over the candles and actually urinated on the shrine," Petitioner "leaned forward in his chair and started to shake his head up and down." (TT: 555-56). At that point, a prison employee abruptly entered the room and said Petitioner had to change his clothing. (TT: 556). The interview ended moments later. (TT: 556, 560).

### B.    Defense Case

Ora Conley ("Conley") testified that she lived at 1330 Clifford Avenue, next door to Gayden's drug house at 1336 Clifford Avenue. (TT: 569-70). At around midnight on October 2, 2005, Gayden came up onto Conley's porch and said, "Ma, somebody hit me with a beer bottle; I'm going to get him." (TT: 571-72, 574). Conley recalled that Gayden was upset, but he did not say who he was going to "get." (TT: 572, 574-75). While Conley was inside getting ice for the visible welt on Gayden's head, he left. (TT: 572). Just minutes later, Conley heard "firecracker" noises coming from the area of the corner store on Miller Street. (TT: 573, 575). Conley agreed on cross-examination that Gayden did not have any weapons on him when she talked to him. (TT: 574-75).

### C.    Verdict and Sentence

Over the prosecutor's objection, the trial court instructed the jury on the lesser-included offenses of first-degree and second-degree manslaughter. (TT: 578-80). The jury acquitted Petitioner of second-degree murder and convicted him of first-degree manslaughter and second-degree criminal possession of a weapon. (TT: 683-86).

At sentencing, the prosecution requested the maximum sentence on both convictions and requested that they run consecutively to the sentence for robbery Petitioner was already serving. (Sentencing Transcript ("ST") (Dkt. No. 33-3): 9-10). The trial court imposed consecutive sentences of twenty-five years on the manslaughter conviction and fifteen years on the weapons-possession conviction and also imposed five years of post-release supervision on each conviction. (ST: 19).

## III.    Post-Conviction Proceedings

### A.    Direct Appeal

Represented by new counsel, Petitioner pursued a direct appeal of his conviction. Appellate counsel filed a brief on Petitioner's behalf. (SR: 374-89).[6] Petitioner filed a *pro se* supplemental appellate brief. (SR: 396-418). On March 23, 2012, the Appellate Division, Fourth Department, New York State Supreme Court ("Fourth Department"), determined that, as a matter of law, the manslaughter and weapons-possession sentences must run concurrently with each other, and it modified the judgment accordingly. *People v. Smith*, 93 A.D.3d 1345, 1346 (4th Dep't 2012). The Fourth Department otherwise affirmed the judgment. *Id.* Petitioner sought leave to appeal as to all claims raised in his counseled and *pro se* briefs (SR: 489-90), and the New York Court of Appeals denied leave on June 29, 2012. *People v. Smith*, 19 N.Y.3d 967 (2012).

### B.    First Motion to Vacate

On January 19, 2011, while his direct appeal was pending, Petitioner filed a *pro se* motion to vacate the judgment and set aside the sentence pursuant to New York Criminal

---

[6] The page citations refer to the Bates-stamped page numbers at the bottom of the pages of the state court records filed by Respondent at Dkt. 33-1 (SR: 1-1629) and Dkt. 33-2 (SR: 1630-2082).

Procedure Law ("C.P.L.") §§ 440.10 and 440.20[7] ("first 440 motion"). (SR: 493-926). Petitioner argued that the prosecutor violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose that Allen had worked as a paid informant for the RPD.

In support of this claim, Petitioner submitted an affidavit from Investigator Jennifer Morales of the RPD Special Investigations Section sworn to on April 15, 2010. (SR: 687-98). Investigator Morales stated that between September 2006, and September 2007, Allen was employed as a paid informant for the RPD in connection with an unrelated homicide. (SR: 689-97).[8]

In opposition to Petitioner's motion, the prosecution submitted an affidavit from Allen, a new affidavit from Investigator Morales, and an affirmation from Assistant District Attorney Patrick Farrell ("ADA Farrell"), the prosecutor in Petitioner's case. Investigator Morales stated that in March 2007, the RPD paid Allen $20 in exchange for information about death threats received by witnesses in Petitioner's case. (SR: 951). In September 2007, before she testified at Petitioner's trial, Allen reported receiving death threats, so Investigator Morales gave her $100 to relocate temporarily. (SR: 959). Once the trial was over, Investigator Morales gave Allen $300 for travel expenses. (SR: 960).

In her affidavit, Allen stated that she had not been paid for her statement to the RPD about the Harris shooting or her testimony at Petitioner's trial. However, she had

---

[7] The sentencing claims asserted under C.P.L. § 440.20 were held in abeyance during the pendency of Petitioner's direct appeal. The Fourth Department resolved the sentencing claims in Petitioner's favor. Thus, after the direct appeal, the only remaining claim in the first 440 motion was the *Brady* claim.

[8] Petitioner obtained the affidavit from fellow inmate Raheen Gayden, who is Danny Gayden's first cousin and the person convicted of killing Andre Knox ("Knox"). (SR: 521, 617, 683). Raheen Gayden apparently submitted the affidavit from Investigator Morales in support of his motion to vacate based on the prosecution's failure to disclose that Allen had worked for the RPD as a paid informant in connection with their investigation of the Knox case.

received money from the RPD for relocation expenses because she feared reprisals for testifying against Petitioner. (SR: 953).

ADA Farrell stated in his affirmation that he was unaware that Allen was a paid informant for the RPD's Special Investigations Section. (SR: 948). He did not know that Investigator Morales had paid Allen $20 in March of 2007 for information about witness-intimidation efforts in Petitioner's case. (*Id.*) He noted, however, that no evidence regarding witness-intimidation was introduced at Petitioner's trial. (*Id.*). ADA Farrell did not know of Investigator Morales's other payments to Allen. (*Id.*). Since Allen was still receiving death threats a month after Petitioner's trial ended, the Monroe County District Attorney's Office gave her $260 to leave Rochester. (*Id.*). ADA Farrell indicated that he had not promised this assistance to Allen before she testified at Petitioner's trial. (*Id.*).

In a decision and order entered October 3, 2012, the New York State Supreme Court, Monroe County (Geraci, J.) (the "first 440 court") denied the motion without a hearing. (SR: 954-67). The first 440 court rejected the *Brady* claim, finding that "[n]othing offered by [Petitioner] indicates any agreement or inducement provided by the prosecutor or the police in exchange for Ms. Allen's testimony at [Petitioner]'s trial." (SR: 966). It further concluded that Petitioner failed to demonstrate that any of the undisclosed evidence "contributed to the verdict in this case." (SR: 967).

Petitioner sought leave to appeal (SR: 969-1012), which the Fourth Department granted on January 9, 2013 (SR: 1018). Petitioner's appointed counsel filed an appellate brief arguing that the first 440 court abused its discretion by denying the motion to vacate without a hearing and that the nondisclosure of Allen's role as a paid informant violated *Brady*. (SR: 1023-55). In its opposition brief, the prosecution conceded that it should have

disclosed Allen's status as a paid informant but maintained that relief under *Brady* was unwarranted because the information was merely cumulative to the other impeachment evidence elicited about Allen. (SR: 1067-70).

The Fourth Department affirmed the first 440 court's judgment on April 29, 2016, finding that Allen's status as a paid informant was not material to the verdict. *People v. Smith*, 138 A.D.3d 1418, 1418 (4th Dep't 2016). The New York Court of Appeals denied leave to appeal. *People v Smith*, 28 N.Y.3d 937 (2016).

### C.    *Coram Nobis* Petition

Petitioner filed a *pro se* petition for a writ of error *coram nobis* alleging that appellate counsel was ineffective for failing to brief various trial court errors, deficiencies in trial counsel's performance, and instances of prosecutorial misconduct. (SR: 1097-1138). The prosecution submitted an affirmation in opposition (SR: 1139-47), and Petitioner filed a reply. (SR: 1148-60). On November 9, 2017, the Fourth Department denied *coram nobis* relief. *People v. Smith*, 155 A.D.3d 1609 (4th Dep't 2017); (SR: 1161-62). Petitioner sought leave to appeal (SR.1163-71), which the prosecution opposed (SR: 1172). The New York Court of Appeals denied leave on February 13, 2018. *People v. Smith*, 30 N.Y.3d 1120 (2018).

### D.    Second Motion to Vacate

By papers dated March 22, 2018, Petitioner filed a *pro se* motion to vacate the judgment pursuant to C.P.L. § 440.10 (the "second 440 motion"). (SR: 1174-1653). Petitioner asserted claims of ineffective assistance of trial counsel, actual innocence, and newly discovered evidence. To support the actual innocence and newly discovered

evidence claims, Petitioner relied on a handwritten "General Affidavit" from Gayden purporting to recant his trial testimony. (SR: 1600). The statement reads as follows:

> My name [is] Danny S. Gayden[.] I was present on 2007 in Monroe County Court during Brian Smith['s] trial and I was pressured into giving false testimony and I would like to clear an inno[c]ent man of his charges because I did not witness him with a gun or have any knowledge of him killing anyone.

(*Id.*). A notary had signed, dated, and stamped the General Affidavit, but Gayden had not signed it. (*Id.*).

The Monroe County Court (Randall, J.) (the "second 440 court") appointed counsel for Petitioner and held an evidentiary hearing on October 3, 2018. (SR: 1968-2027 (Transcript of Second 440 Hearing)). The defense called Gayden; the prosecution called Monroe County District Attorney's Office's Investigator Samuel Soprano, Jr. ("Soprano").

Gayden testified that he was 32 years-old and was serving a term of supervised release until 2020 on a federal drug conviction. (SR: 1975). He acknowledged testifying at Petitioner's trial that he saw Petitioner shoot Harris. (SR: 1977). However, he did not see Petitioner commit the shooting. (SR: 1982). With regard to his February 5, 2018 statement, Gayden testified that he appeared before a notary public at the Rochester public library on that date. (SR: 1979). He said he did not remember seeing a line for his signature on the affidavit form; if he had, he would have signed it. (SR: 1986-87).

When asked how he had been "pressured" into testifying, Gayden replied that he was "a lot younger" then, "didn't really know anything about the criminal justice system," and "investigators and DA's were . . . promising [him] certain things." (SR: 1980). When asked who "pressured" him, Gayden could only recall Investigator Morales's name. (SR: 1981). Gayden said that Investigator Morales told him, "if [I] say this about a murder that

[I] didn't even witness, you know, [Petitioner] having a gun or anything of that nature, all this would disappear and [I] will come out like a flower." (SR: 1980-81). Gayden did not want to go to prison so he testified that he saw Petitioner shoot Harris. (SR: 1981-82). Gayden said that he had come forward with the affidavit because, "after growing up" and realizing "right is right and wrong is wrong," he "wanted to right [his] wrongs" and "pretty much clear an innocent man." (SR: 1982-83).

Soprano testified for the prosecution that he met with Gayden at the Monroe County Jail on September 12, 2018, and asked him about his recantation. (SR: 2016). At first, Gayden said he could not remember what was in his affidavit. (SR: 2017). After reviewing it, Gayden affirmed that he had, in fact, written it. (*Id.*). Gayden said to Soprano, "I never signed that so it doesn't really mean anything anyways." (SR: 2018). When Soprano asked why he wrote the affidavit, Gayden said that "mutual friends" asked him to "help get [Petitioner] a new trial." (SR: 2017-18). Gayden told Soprano that the recantation affidavit was not true. (SR: 2017).

In a written decision and order dated December 11, 2018, the second 440 court denied the motion in its entirety. (SR: 2043-50). With regard to all of Petitioner's claims not based on Gayden's recantation—that is, the ineffective assistance claims—the second 440 court denied them because Petitioner could have raised them adequately in the first 440 motion. (SR: 2047 (citing N.Y. Crim. Proc. Law § 440.10(3)(c)). To the extent some of those claims were based on the trial record, the second 440 court determined that it must deny them because they could have been raised on direct appeal. (*Id.* (citing N.Y. Crim. Proc. Law § 440.10(2)(c)). With regard to the off-the-record allegations concerning trial counsel, the second 440 court determined that Petitioner received

meaningful representation under the New York State constitutional standard. He also failed to show that trial counsel's performance was objectively unreasonable or resulted in prejudice to the defense; therefore, he failed to satisfy the federal constitutional standard. (SR: 2048-49).

The second 440 court summarily concluded Petitioner had not adduced "sufficient evidence" to prove he was actually innocent of killing Harris. (SR: 2049).

Finally, as to the newly discovered evidence claim, the second 440 court found that Gayden's "lone statement" that "he lied at trial and is now telling the truth is completely unreliable and is insufficient to support a determination to vacate the defendant's judgment." (SR: 2050). Petitioner sought leave to appeal (SR: 2051-75), which the prosecution opposed (SR: 2076-80). The Fourth Department denied leave on March 29, 2019. (SR: 2081-82).

## III. Federal Habeas Petition

In his timely filed petition (Dkt. No. 1), Petitioner asserts fifteen enumerated grounds for relief: the prosecution violated its *Brady* obligations by failing to disclose Allen's status as paid informant (*id.* at 7, Ground One); the first 440 court erroneously denied the first 440 motion without an evidentiary hearing (*id.*, Ground Two); appellate counsel was ineffective (*id.* at 7-8, Grounds Three, Four, and Five); trial counsel was ineffective (*id.* at 9, Grounds Six; *id.* at 11, Grounds Thirteen, and Fourteen); Gayden's recantation is newly discovered evidence that would have resulted in a different verdict (*id.* at 10, Ground Seven); Petitioner is actually innocent (*id.*, Ground Eight); the verdict was against the weight of the credible evidence (*id.*, Ground Nine; *id.* at 11, Ground Twelve); the trial court erroneously allowed the introduction of prejudicial evidence in

violation of the *Molineux* rule (*id.* at 10, Ground Ten); the protective order issued in connection with the *Wade* hearing deprived him of the right to challenge the identifications as unduly suggestive (*id.* at 11, Ground Eleven); and pre-indictment and post-indictment delays violated Petitioner's speedy trial rights under the Due Process Clause and the Sixth Amendment (*id.* at 12, Ground Fifteen).

Prior to Respondent answering the petition, Petitioner sought a stay-and-abeyance in connection with the claims raised in the then-pending second 440 motion. (Dkt. No. 3). The Court (Vilardo, D.J.) denied the motion without prejudice. (Dkt. No. 9). After Petitioner filed a renewed motion to stay (Dkt. No. 11), the case was reassigned to United States District Judge John L. Sinatra, Jr. (Dkt. No. 12), who referred the matter to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). (Dkt. No. 15). Respondent opposed the motion to stay. (Dkt. No. 18).

This Court issued a report and recommendation recommending that the motion for a stay-and-abeyance be denied as moot because the second 440 motion had been resolved; denying the motion to amend as moot, to the extent it sought to add the grounds raised in the renewed motion to stay, because those claims were already raised in the original petition; and denying the motion to amend, to the extent it requested permission to add "additional" claims that might have arisen in the state court proceeding because Petitioner had not identified any additional grounds for relief he wished to add. (Dkt. No. 27). Judge Sinatra adopted the report and recommendation and ordered Respondent to answer the petition. (Dkt. No. 28).

Respondent filed a response (Dkt. No. 33, 36 (amended)), attaching two volumes of state court records (Dkt. Nos. 33-1 & 33-2) and one volume of state court transcripts

(Dkt. No. 33-3). Respondent also filed a memorandum of law (Dkt. No. 37). Petitioner filed a traverse (Dkt. No. 29) and subsequently filed a reply (Dkt. No. 38) to Respondent's memorandum of law.

## STANDARD OF REVIEW

The petition post-dates the April 24, 1996 enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214. Therefore, AEDPA's amendments to 28 U.S.C. § 2254 govern the Court's disposition of the petition. AEDPA "revised the conditions under which federal courts may grant habeas relief to a person in state custody." *Kruelski v. Connecticut Superior Ct. for Jud. Dist. of Danbury*, 316 F.3d 103, 106 (2d Cir. 2003). Now, federal courts may not grant the writ with respect to claims subject to 28 U.S.C. § 2254(d) unless the petitioner shows that the state court's decision "was contrary to" federal law as established by the holdings of the Supreme Court, *see id.* § 2254(d)(1); or that it "involved an unreasonable application of" such law, *id.* § 2254(d)(1); or that it "was based on an unreasonable determination of the facts" in light of the record before the state court, *id.* § 2254(d)(2).

"Under [AEDPA's] standard, a federal court may not issue a writ of habeas corpus simply because it thinks the state court 'applied clearly established federal law erroneously or incorrectly.'" *McCray v. Capra*, 45 F.4th 634, 640 (2d Cir. 2022), *cert. denied*, 214 L. Ed. 2d 369, 143 S. Ct. 624 (2023) (quoting *Williams v. Taylor*, 529 U.S. 362, 411 (2000)). "Instead, relief is warranted under section 2254 only 'where there is no possibility fair[-]minded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.'" *Id.* (quoting *Harrington v. Richter*, 562 U.S. 100, 102 (2011) (alterations in original).

<u>**DISCUSSION**</u>

I.    *Brady* **Violation (Ground One)**

Petitioner asserts that the prosecution violated its due process obligations under *Brady* by failing to disclose evidence that Allen was a paid informant for the RPD. (Dkt. No. 1 at 7 ¶ 22(A)). The Fourth Department concluded that although the withheld information "may have provided the defense with additional impeachment material, it cannot be said that there is a reasonable possibility that the result at trial would have been different had the information been disclosed." *Smith*, 138 A.D.3d at 1419-20. Respondent argues that the Fourth Department's decision was neither contrary to, nor an unreasonable application of, *Brady* and its progeny. (*See* Dkt. No. 37 at 19-22). This Court agrees and recommends that habeas relief be denied on Ground One.

*Brady* held that the suppression of evidence favorable to an accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. "[T]he duty to disclose such evidence is applicable even though there has been no request by the accused, and that . . . duty encompasses impeachment evidence as well as exculpatory evidence." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citations omitted). Since the prosecution conceded on appeal of the first 440 motion that the undisclosed impeachment evidence concerning Allen was favorable to the defense and had been suppressed (*see* SR: 1067), the only disputed *Brady* component is materiality. Because the state court adjudicated the *Brady* claim on the merits, the "only question that matters under § 2254(d)(1)," *Harrington*, 562 U.S. at 102 (internal quotation marks omitted), is "whether it is possible fair[-]minded

jurists could disagree," *id.*, that the state court's ruling on the lack of materiality is "inconsistent with the holding in a prior decision of th[e] [Supreme] Court." *Id.*

"The materiality of the undisclosed evidence is evaluated 'in the context of the entire record.'" *McCray*, 45 F.4th at 641 (quoting *Turner v. United States*, 582 U.S. 313, 325 (2017)). "[I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed." *United States v. Agurs*, 427 U.S. 97, 112 (1976). Stated another way, "the materiality standard for *Brady* claims is met when 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Banks v. Dretke*, 540 U.S. 668, 698 (2004) (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)).

"In general, impeachment evidence has been found to be material where the witness at issue 'supplied the only evidence linking the defendant(s) to the crime,'" *United States v. Payne*, 63 F.3d 1200, 1210 (2d Cir. 1995) (quoting *United States v. Petrillo*, 821 F.2d 85, 90 (2d Cir.1987)); *see also Giglio v. United States*, 405 U.S. 150, 154-55 (1974) (finding that a promise not to prosecute a cooperating witness was material under *Brady* where "the Government's case depended almost entirely on [his] testimony; without it there could have been no indictment and no evidence to carry the case to the jury"); *Banks*, 540 U.S. at 700 (holding that impeachment evidence was material where it pertained to a witness whose testimony was "crucial to the prosecution" and who was, in the prosecution's own judgment, "of the utmost significance" to its case).

"In contrast, a new trial is generally not required when the testimony of the witness is 'corroborated by other testimony,'" *Payne*, 63 F.3d at 1210 (quoting *Petrillo*, 821 F.2d at 89), or when the suppressed impeachment evidence merely furnishes an additional

basis on which to impeach a witness whose credibility has already been shown to be questionable," *id.* (citing *Petrillo*, 821 F.2d at 90 (holding that withheld impeachment evidence was not material where "ample evidence was introduced to show [witness]'s propensity and motive to lie")); *see also Giglio*, 405 U.S. at 154 (impeachment evidence not material where it is "'possibly useful to the defense but not likely to have changed the verdict'") (quoting *United States v. Keogh*, 391 F.2d 138, 148 (2d Cir. 1968)).

The Court disagrees with Petitioner's contention that Allen's testimony was the "linchpin of the prosecution's case." (SR: 1039). To the contrary, as the Fourth Department observed, "the verdict did not turn solely or predominantly on [Allen]'s testimony inasmuch as other evidence established defendant's responsibility for the shooting," *Smith*, 138 A.D.3d at 1420. Gayden provided eyewitness testimony of the shooting, and the jury viewed the surveillance camera footage of the shooting. There was no dispute that the shooter depicted in the videotape fired the gun with his left hand. (*See* TT: 607-08 (defense counsel stated that "[t]he shooter in the video . . . fires the gun with his left hand"); *see also* TT: 639 (prosecutor stated it was "clear from both the photographs in [sic] the video, again, that the shooter, Brian Smith, is extending his left hand"). Petitioner admitted to Sergeant Mariano he is left-handed, and Gayden testified that he is right-handed. In addition, Petitioner told Gayden he bought a .380-caliber gun from a crack addict, Gayden saw Petitioner test-fire the same .380-caliber gun at a futon in the basement of Gayden's drug house, and the ballistics evidence established that the .380-caliber gun used to shoot Harris also was used to shoot the futon at the drug house.

The Fourth Department stated that "[e]ven assuming, *arguendo,* that [Allen]'s testimony was important," *Smith*, 138 A.D.3d at 1420, "her credibility was strongly

impeached on far more critical issues, including her ongoing relationship with [Gayden,] the only other suspect who reasonably could have been implicated in the shooting." *Id.* The trial record amply supports this finding. Allen testified that she had known Gayden for about ten years, that she loved him, and that they had a young son together. (TT: 377, 419). Allen testified that she pleaded guilty, as a youthful offender, to criminal possession of a controlled substance in June of 2005 and received a probation-only sentence. (TT: 376-77, 389). Even after her guilty plea, Allen continued to sell drugs to help Gayden raise bail money. (TT: 391-92). Allen testified that Gayden called her almost every day from jail, sometimes numerous times a day. (TT: 417-18).

Allen also admitted that on November 25, 2005, RPD officers executed a search warrant at her apartment looking for a gun; however, at Gayden's request, she had already sold it to raise bail money for him. (TT: 393). During the search, the police found bags of marijuana, but Allen was not charged with violating her probation or with any new crimes. (TT: 393-94). Further, at Gayden's direction, Allen talked to the police about the Harris shooting. (TT: 418-19).

The Fourth Department reasonably determined that this evidence illustrated Allen's motive to fabricate since it showed that she benefited in two significant ways through her cooperation. First, by implicating Petitioner, she cleared Gayden's name and secured his freedom. Second, Allen herself avoided incarceration or other criminal penalties in connection with the drugs found at her residence. With Allen's veracity already shown to be questionable, the Fourth Department reasonably concluded that the undisclosed impeachment evidence diminished greatly in value and would not have changed the verdict.

Petitioner has not established that the Fourth Department's rejection of the *Brady* claim "was so lacking in justification that there was an error . . . beyond any possibility for fair[-]minded disagreement." *Harrington*, 562 U.S. at 102. Because the Fourth Department did not unreasonably apply, or rule in a manner contrary to, *Brady*, the Court recommends denying Ground One.

## II.    Denial of Evidentiary Hearing on First 440 Motion (Ground Two)

In Ground Two, Petitioner asserts that the failure to hold a hearing before denying the second 440 motion was an abuse of discretion. (*See* Dkt. No. 1 at 7 ¶ 22(B)). Petitioner raised this claim on his appeal of the first 440 motion. (SR: 1075-80). The Fourth Department, in affirming the first 440 court's order, did not explicitly discuss the claim regarding the hearing. *See Smith*, 138 A.D.3d at 1419. However, by affirming the first 440 court's rejection of the *Brady* claim, the Fourth Department implicitly rejected the claim that an evidentiary hearing was necessary. In any event, as Respondent argues, Ground Two does not present a cognizable constitutional issue.

"[E]ach State has created mechanisms for both direct appeal and state postconviction review, even though there is no constitutional mandate that they do so." *Lackawanna Cnty. Dist. Attorney v. Coss*, 532 U.S. 394, 402 (2001). Accordingly, "alleged errors in a postconviction proceeding are not grounds for § 2254 review because federal law does not require states to provide a post-conviction mechanism for seeking relief." *Word v. Lord*, 648 F.3d 129, 131 (2d Cir. 2011) (per curiam). Since the first 440 court's refusal to hold an evidentiary hearing does not present a federal constitutional issue, the Court recommends dismissing Ground Two as not cognizable in this habeas proceeding. *See, e.g., Diaz v. Greiner*, 110 F. Supp. 2d 225, 235 (S.D.N.Y. 2000) ("Petitioner's

unsupported assertion that the trial court denied his (third) CPL § 440.10 motion without a hearing violated due process is not cognizable on federal habeas review.").

## III.    Ineffective Assistance of Appellate Counsel (Grounds Three, Four, and Five)

In the petition, Petitioner groups the allegations regarding appellate counsel's ineffectiveness under Ground Three (Dkt. No. 1 at 7-8 ¶ 22(C)); Ground Four (*id.* at 8 ¶ 22(D)); and Ground Five (*id.* at 8 ¶ 22(E)). Petitioner previously raised these allegations in the *coram nobis* application (*see* SR: 1107-37), which the Fourth Department rejected in a one-word opinion—"denied." *Smith*, 155 A.D.3d at 1609. This unexplained disposition constitutes an adjudication on the merits for purposes of 28 U.S.C. § 2254(d). *See Sellan v. Kuhlman*, 261 F.3d 303, 314 (2d Cir. 2001). Because the Fourth Department did not articulate its reasoning, this Court must "determine what arguments or theories . . . could have supported" its decision and "then must ask whether it is possible fair[-]minded jurists could disagree that that those arguments or theories are inconsistent with the holding in a prior decision of th[e] [Supreme] Court." *Harrington*, 562 U.S. at 102.

### A.    Legal Standard

The test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), for evaluating trial counsel's performance "applies equally to claims of ineffective assistance of appellate counsel on a defendant's first appeal as of right." *Aparicio v. Artuz*, 269 F.3d 78, 95 (2d Cir. 2001) (citing *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985)). "As to the first prong of the *Strickland* test—deficient performance—it is not sufficient for the habeas petitioner to show merely that [appellate] counsel omitted a nonfrivolous argument." *Id.* (citing *Evitts*, 469 U.S. at 394). Appellate counsel "does not have a duty to advance every nonfrivolous argument that could be made." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994).

"To satisfy the second, prejudice prong, the defendant must show that there is a 'reasonable probability' that, but for the deficiency, 'the result of the proceeding would have been different.'" *Aparicio*, 269 F.3d at 95 (quoting *Strickland*, 466 U.S. at 694); *see also Lynch v. Dolce*, 789 F.3d 303, 311 (2d Cir. 2015) ("[A] petitioner must show that, had his claim been raised on appeal, there is a reasonable probability that it would have succeeded before the state's highest court.").

Failure to fulfill both the performance and prejudice prongs is fatal to a *Strickland* claim. *See* 466 U.S. at 697 ("[T]there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one."). "[W]hile in some instances 'even an isolated error' can support an ineffective-assistance claim if it is 'sufficiently egregious and prejudicial,' it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." *Harrington*, 562 U.S. at 111 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). On habeas review, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Id.* at 101.

## B. Application

Respondent argues that the Fourth Department reasonably determined that appellate counsel was not ineffective for declining to raise the arguments set forth in Grounds Three, Four, and Five of the petition. (Dkt. No. 37 at 23-36). The Court agrees and recommends dismissing Grounds Three, Four, and Five as meritless.

### 1.    Appellate Counsel's Failure to Raise Trial Errors (Ground Three)

Ground Three in the petition corresponds to Ground I in the *coram nobis* application (SR: 1109-16), which asserted that appellate counsel failed to raise the following "egregious" trial errors: (a) the prosecution's evidence did not satisfy the corroboration rule for accomplice testimony set forth in C.P.L. § 60.22 (SR: 1110-12); and (b) the trial court's *Molineux* ruling was erroneous and highly prejudicial (SR: 1112-16).

### a.    Insufficiency of Corroborating Evidence

Petitioner asserts that appellate counsel should have challenged the sufficiency of the evidence corroborating Gayden's accomplice testimony as required by C.P.L. § 60.22. (*See* Dkt. No. 1 at 7-8, ¶ 22(C); SR: 1110-12). Respondent counters that Gayden was not an accomplice as a matter of state law and therefore the argument had no chance of succeeding on appeal. (*See* Dkt. No. 37 at 28-29).

The Court notes, however, that the trial court issued a jury charge stating that Gayden *was* an accomplice as a matter of law. (TT: 580). Such a charge is required in New York where the trial court "determines on the evidence that a witness comes within the meaning of CPL 60.22(2)," *People v. Sage*, 23 N.Y.3d 16, 23 (2014), i.e., that the witness "may reasonably be considered to have participated in: (a) [t]he offense charged; or (b) [a]n offense based upon the same or some of the same facts or conduct which constitute the offense charged," *id.* (quoting N.Y. Crim. Proc. Law § 60.22(2) (alterations in original)). Therefore, contrary to Respondent's assertion, C.P.L. § 60.22(1)'s corroboration rule is relevant to Petitioner's case.

Under C.P.L. § 60.22(1), "[t]he quantum of evidence necessary to satisfy the statutory corroboration requirement is enough if it tends to connect the defendant with the

commission of the crime in such a way as may reasonably satisfy the jury that the accomplice is telling the truth . . . ." *Sage*, 23 N.Y.3d at 27 (internal quotation marks and citations omitted). *Id.* "The required corroboration need not prove the defendant's guilt, and it may be based on evidence that sufficiently harmonizes with the accomplice testimony so as to furnish the necessary connection between defendant and the crime." *Id.* Evidence "may be considered corroborative even though it simply supports the accomplice testimony, and does not independently incriminate the defendant." *People v. Reome*, 15 N.Y.3d 188, 190 (2010).

The prosecutor adduced evidence that reasonably could have satisfied the jury that Gayden was telling the truth about the manner in which the shooting was committed and Petitioner's involvement in it. For instance, the jury viewed the surveillance videotape showing that the shooting was committed by a man on a bicycle firing a gun with his left hand; Corporal Tripoli testified that he observed Petitioner signing a document with his left hand (TT: 449-51); Petitioner admitted to Sergeant Mariano that he is left-handed (TT: 553-54); and Petitioner twice admitted to Allen that he "shot the boy." (TT: 382-83, 385-86). This "corroborative evidence [was] such that when read with [Gayden]'s testimony, makes it more likely that [Petitioner] committed the offense, and thus tends to connect him to it." *Sage*, 23 N.Y.3d at 27 (internal quotation marks and citation omitted).

Petitioner challenges the use of the videotape as corroboration, noting it was grainy and did not show the facial features of the shooter. He also argues that Allen could not supply corroborating evidence due to her credibility issues and certain inconsistencies between her and Gayden's testimony. The jury, however, was exclusively responsible for assessing witness credibility, weighing the evidence, and determining the evidentiary

inferences to be drawn from it. *See Maldonado v. Scully,* 86 F.3d 32, 35 (2d Cir. 1996) (stating that "assessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal."). Because Petitioner has not demonstrated that this argument was likely to be successful on appeal, he has not shown either that appellate counsel unreasonably omitted it or that he was prejudiced by the omission.

### b.    Erroneous *Molineux* Ruling

Petitioner contends that appellate counsel failed to challenge the trial court's *Molineux* ruling permitting Gayden to testify about seeing Petitioner fire the .380-caliber gun at the futon a few weeks before the shooting. (Dkt. No. 1 at 8, ¶ 22(C), SR: 1113-15). Petitioner asserts that although the prosecutor assured the trial court at the *Molineux* hearing that he would supply additional evidence connecting Gayden's testimony to Petitioner (*see* TT: 9-10), he never did so. Petitioner is incorrect. Through the testimony of the two officers who recovered the projectiles at Gayden's drug house (TT: 501-04, 509-10); and the expert testimony of the firearms examiner who analyzed the projectiles (TT: 522-36), the prosecutor supplied the connecting evidence he had promised at the *Molineux* hearing. Because this argument was factually unsupported, appellate counsel reasonably decided not to include it. And because there is no reasonable probably it would have altered the outcome of the appeal, Petitioner was not prejudiced.

### 2.    Appellate Counsel's Failure to Raise Trial Counsel's Ineffectiveness (Ground Four)

Ground Four in the petition corresponds to Ground II in the *coram nobis* application (SR: 1117-31), which asserted that appellate counsel erroneously omitted the following examples of trial counsel's ineffectiveness: (a) failing to object to Gayden's testimony

about Petitioner's rap lyrics (SR: 1117-18); (b) eliciting testimony from Gayden that he took a polygraph test (SR: 1118-20); (c) failing to object to Investigator May's bolstering of Gayden's testimony (SR:1120-21); (d) failing to object to, and request a limiting instruction for, Gayden's and Sergeant Mariano's testimony about Petitioner's attempt to retrieve the surveillance camera footage and his defilement of the sidewalk memorial (SR: 1121-29); and (e) failing to request a missing witness instruction as to grand jury witness Anthony White (SR: 1129-31).

### a.    Failure to Object to Rap Lyrics

Petitioner claims that trial counsel should have objected to Gayden's testimony that the night after the shooting, he saw and heard Petitioner rapping that he was a "killer" and "did it on Miller." (TT: 227). "[D]ecisions such as when to object and on what grounds are primarily matters of trial strategy and tactics, and thus are virtually unchallengeable absent exceptional grounds for doing so." *United States v. Cohen*, 427 F. 3d 164, 170 (2d Cir. 2005) (internal quotation marks and citations omitted). Petitioner has not set forth any grounds, let alone exceptional ones, for overcoming the presumption of reasonableness afforded to trial counsel's strategic decision not to object.

As a matter of New York State evidentiary law, a party's admissions to a material fact are competent evidence against him or her, regardless of where, when, or to whom the party makes the admissions. *People v. Chico*, 90 N.Y.2d 585, 589 (1997). Although Petitioner did not explicitly say, "I killed Harris on Miller Street," the undisputed proof at trial was that Harris was killed at the corner of Miller Street and Clifford Avenue. Trial counsel reasonably could have determined that the rap lyric contained at least an implied admission of responsibility for Harris's death and was therefore admissible. *See, e.g.,*

*People v. McPhillips*, 21 N.Y.S.3d 134, 135 (2d Dep't 2015) (statement to victim by defendant, "'I'm not going back to prison' . . . constituted an implicit acknowledgment by the defendant that he had engaged in conduct that would result in him 'going back to prison'" and thus the "statement contained an 'implied admission of guilt'") (citations omitted).

Because Petitioner has not demonstrated that there was a winning objection to make to Gayden's testimony, this ineffective assistance of trial counsel claim was weak, and appellate counsel reasonably declined to include it. And since the argument had no reasonable probability of succeeding on appeal, its omission did not result in prejudice.

### b.    Eliciting Testimony Regarding Polygraph Test

While cross-examining Gayden, trial counsel elicited that he underwent a polygraph examination as a condition of his cooperation agreement. (TT: 332). When that portion of his cross-examination concluded, trial counsel sought a colloquy outside the jury's presence. (TT: 342). He explained that since the discovery turned over by the prosecutor contained no polygraph results, he believed that Gayden had not taken a polygraph test and therefore expected him to testify accordingly. (TT: 347-48). Trial counsel asked the trial court to strike the question and Gayden's answer but not instruct the jury that the evidence had been stricken unless the jury later requested a readback of the testimony. (TT: 348-49). Counsel explained that he did not "want to bring attention to [the testimony]." (TT: 348).

Petitioner correctly notes that polygraph results are inadmissible under New York State law; however, the results of Gayden's test were not revealed at trial. Nonetheless, Petitioner argues, the only possible inference was that Gayden must have passed the

polygraph examination because he was allowed to plead guilty under the cooperation agreement.

"The decision whether to object, to avoid calling any additional attention to potentially damaging statements, is encompassed within the category of strategic legal decision-making." *Gilmore v. Lewin*, No. 9:05-CV-1378, 2007 WL 3274863, at *3 (N.D.N.Y. Nov. 5, 2007) (citing *Gatto v. Hoke*, 809 F. Supp. 1030, 1039 (E.D.N.Y. 1992) ("[C]ounsel's failure to object to the prosecutor's summation represents his tactical decision to avoid underscoring the prosecutor's statements so as to draw the jury's attention to them.")). The decision whether to request a limiting instruction likewise is a matter of trial strategy. *See Conteh v. United States*, 226 F. Supp. 2d 514, 518-19 (S.D.N.Y. 2002) (finding that counsel's failure to seek limiting instruction as to inadmissible hearsay was reasonable tactical decision where instruction would have risked drawing jury's attention to potentially damaging evidence). The record reflects that trial counsel made a considered decision not to object to Gayden's testimony in the presence of the jury and to decline an immediate curative instruction. Petitioner has not overcome the presumption of reasonableness accorded to this strategic choice. Therefore, this ineffectiveness claim was not a strong candidate to include on appeal, and appellate counsel's decision to omit it was reasonable.

### c.    Failure to Prevent Bolstering by Investigator May

Petitioner faults trial counsel for failing to establish the lack of independent proof connecting him to the projectiles recovered in the basement of Gayden's drug house. Petitioner concedes that trial counsel objected to Investigator May's testimony that, during the execution of the search warrant, he and the officers "went into the basement where

he had been directed to by Danny Gayden." (TT: 502-03). Although the trial court sustained the objection as to the latter part of the answer, i.e., the reference to what Gayden had told Investigator May (TT: 503), Petitioner claims that trial counsel should have done more.

First, Petitioner says that counsel should have cross-examined Investigator May to show that the police investigation did not support Gayden's testimony that Petitioner had fired the gun at the futon. "An attorney's decision not to impeach a witness may fall within the range of objectively reasonable trial strategies at counsel's disposal." *Lewis v. United States*, No. 10-CV-00718 ENV, 2012 WL 2394810, at *4 (E.D.N.Y. June 25, 2012) (citing *Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002)). As discussed above, because the ballistics evidence recovered from the drug house *did* support Gayden's testimony, there is no reasonable probability that any cross-examination of Investigator May would have yielded the desired result. In fact, it might have done the defense more harm than good.

Second, Petitioner claims that trial counsel should have requested a "specific curative instruction" after the trial court sustained his objection to Investigator May's testimony about what Gayden had told him. Whether to object to allegedly improper evidence or request a curative instruction are matters of trial strategy that reviewing courts generally will not second-guess. *See, e.g., Smith v. Keane*, 101 F.3d 1392, 1996 WL 364539, at *3 (Table) (2d Cir. 1996) ("Trial counsel's conscious choice to decline to request a curative instruction or to move for a mistrial immediately after the prosecutor made the statement can be justified as a tactical decision."); *Evans v. Bennett*, No. 98CV1706 (LEK/DRH), 2001 WL 36006042, at *8 (N.D.N.Y. Nov. 20, 2001) ("Counsel's

failure to request curative instructions or move for a mistrial were purely questions of strategy.").

Trial counsel reasonably could have decided that asking for a curative instruction might have emphasized Investigator May's testimony that Gayden provided information that led to the officers' discovery of the projectiles in and around the futon, and thereby indirectly bolstered the credibility of Gayden's testimony that Petitioner fired the .380-caliber gun into the futon. Trial counsel's decision not to request a curative instruction cannot be deemed ineffective assistance where, as here, the "'strategy of silence on defense counsel's part [is] quite appropriate.'" *Robinson v. Keane*, No. 92 Civ. 6090, 1999 WL 459811, at *2 (S.D.N.Y. June 29, 1999) (alteration in original) (quoting *United States v. Sanchez*, 790 F.2d 245, 253 (2d Cir. 1986)); *see also Smith v. Walsh*, No. 02 CIV. 5755(WHP[])(JCF[])], 2003 WL 21649485, at *6 (S.D.N.Y. July 14, 2003) (finding that defense counsel's failure to request a curative instruction was "appropriate trial strategy," where counsel informed the trial judge "that a curative jury instruction would only serve to highlight the statement in the juror's minds").

Petitioner has not overcome the presumption of reasonableness accorded to appellate counsel's strategic choice not to include this weak claim of trial counsel's ineffectiveness. Because there is no reasonable probability that the underlying ineffectiveness claim would have succeeded on appeal, Petitioner cannot show he prejudice resulting from appellate counsel's decision to omit it.

### d. Failure to Object to *Molineux* Testimony by Gayden and Sergeant Mariano

Petitioner claims that appellate counsel should have argued that trial counsel was ineffective for failing to object on *Molineux* grounds to Gayden's and Sergeant Mariano's

testimony concerning Petitioner's defilement of the sidewalk memorial. Courts in New York State have viewed the "failure to object to alleged *Molineux* evidence and to request a limiting instruction '[as] a tactical decision'" which does not "constitute ineffective assistance [of counsel]." *People v. Smith (Labradford)*, 118 A.D.3d 1492, 1493 (4th Dep't 2014) (quoting *People v. Taylor*, 2 A.D.3d 1306, 1308 (4th Dep't 2003)); *see also People v. Motayne*, 128 A.D.3d 732, 733 (2d Dep't 2015) ("Unsuccessful trial strategies and tactics do not constitute ineffective assistance of counsel."). Given this precedent, appellate counsel reasonably could have determined that an ineffective assistance argument predicated on trial counsel's failure to object to alleged *Molineux* evidence was unlikely to succeed.

The Court notes that appellate counsel did challenge Gayden's and Sergeant Mariano's testimony as unduly prejudicial and argued that, despite the lack of preservation, the claim warranted review under the Fourth Department's "interest of justice" jurisdiction. (SR: 380-83). This was not an unreasonable approach, since intermediate appellate courts in New York State can, and do, entertain even unpreserved issues "as a matter of discretion in the interest of justice." C.P.L. § 470.15(6). *See, e.g., People v. Hilton*, 166 A.D.3d 1316, 1321 (3d Dep't 2018) ("Even if defendant had preserved his claims with respect to the *Molineux* ruling and charge, they are without merit."). Petitioner has not overcome the presumption of reasonableness accorded to appellate counsel's strategic decision to raise the *Molineux* issue as a stand-alone evidentiary claim instead of as a predicate for an ineffective assistance claim. Moreover, because he has not demonstrated a reasonable probability that it would have succeeded,

he has not shown that appellate counsel's decision not to include it prejudiced the outcome of his appeal.

### e.    Failure to Request Missing Witness Charge for Anthony White

Petitioner asserts that trial counsel should have requested a missing witness charge for Anthony White ("White"), who allegedly "testified before the Grand Jury that he was standing on the corner of Clifford and Miller in front of the store[] when he saw appellant Smith shoot the victim." (SR: 1129 (citing "GJM[9] 8-10")). At a pre-trial appearance, trial counsel noted that White, who was on the prosecution's witness list, was in prison. (9/04/07 Tr. (Dkt. No. 33-3) at 8). The prosecutor accordingly agreed to provide a copy of White's rap sheet. (*Id.*). The prosecutor did not call White as a witness, and defense counsel did not request a missing witness charge.

"A party seeking a missing witness charge must demonstrate, among other things, that the witness would provide non-cumulative testimony." *Davis v. Mantello*, 42 F. App'x 488, 491 (2d Cir. 2002) (unpublished opn.) (citing *People v. Gonzalez*, 68 N.Y.2d 424, 427 (1986)). "A missing witness charge is not appropriate when the witness's testimony would merely corroborate the testimony of other witnesses." *Id.* (citing *People v. Keen*, 94 N.Y.2d 533, 539 (2000)); *see also People v. Williams*, 10 A.D.3d 213, 217 (1st Dep't 2005) ("A party is not entitled to a missing witness charge if the testimony of the uncalled witness would be merely cumulative, even if the opposing party has called only one witness to testify on a given material issue." (internal citations omitted)).

---

[9] "GJM" presumably refers to the grand jury minutes which are not in the state court records provided by Respondent. The Court therefore cannot verify the substance of White's expected testimony. The Court will assume for the sake of argument that he would have testified as described by Petitioner.

Petitioner has not demonstrated he was entitled to a missing witness charge as to White, since his proposed testimony arguably would have been cumulative to Gayden's eyewitness account of the shooting. Moreover, in his *pro se* supplemental appellate brief, Petitioner raised a claim that trial counsel erroneously failed to request a missing witness charge for White. (SR: 396, 413-15). The Fourth Department summarily rejected it as meritless. *Smith*, 93 A.D.3d at 1346 (rejecting ineffective assistance claim because "defendant failed to establish the absence of a strategic or other legitimate explanation for defense counsel's alleged shortcomings"). Petitioner has not explained how appellate counsel could have briefed the issue differently so as to persuade the Fourth Department it had merit.

Petitioner has not overcome the presumption of reasonableness accorded both to trial counsel's strategic decision as to whether to request a missing charge and appellate counsel's strategic decision as to which issues to include on appeal. Because Petitioner raised the same claim in his *pro se* brief and the Fourth Department rejected it, he cannot show prejudice as a result of appellate counsel's decision not to assert it.

### 3. Appellate Counsel's Failure to Raise Prosecutorial Misconduct (Ground Five)

In Ground Five, Petitioner asserts that appellate counsel should have argued that the prosecutor committed misconduct during his summation. First, Petitioner faults the prosecutor for misstating the facts and referring to facts not in evidence when he told the jury:

> At that point, the Defendant, Brian Smith, said, fuck this, turned his bicycle around, pulled up on the sidewalk and fired at least five shots into the vehicle of Triston Harris as Triston Harris was getting in the driver's seat.

(TT: 620; *see also* TT: 635 ("[W]hat did [Gayden] tell you? Brian Smith said, fuck this, turned his bicycle around. . . ."). According to Petitioner, Gayden did not testify either that Petitioner said "fuck this" just prior to the shooting or that Petitioner turned his bike around before firing the gun.

Contrary to Petitioner's contention, Gayden *did* testify on cross-examination that Petitioner turned his bicycle around before shooting at Harris's car:

> Q:    Well, how far had [Petitioner] gone up Clifford Avenue before this occurred, before he is going towards [Harris]?
> A:    Uhm, he had rode up in the front entrance by the store, and had to turn his bike around.
> Q:    And then it is your testimony that [Petitioner] started shooting at the car; is that correct?
> A:    Yes.

(TT: 293-94).

"[R]eversal is warranted only if the [prosecutorial] misconduct has caused such substantial prejudice to defendant that he was denied due process." *People v. Griffin*, 151 A.D.3d 1824, 1825 (4th Dep't 2017) (collecting cases). Although Petitioner correctly notes that Gayden did not testify that Petitioner said, "fuck this" before turning his bicycle around, he fails to explain how this particular comment prejudiced the defense. Due to the absence of prejudice, this prosecutorial misconduct claim was a weak prospect for appeal. Thus, it was reasonable for appellate counsel to omit it.

Second, Petitioner contends that appellate counsel overlooked a meritorious claim based on the prosecutor's alleged vouching for Gayden's credibility. More specifically, Petitioner points to the prosecutor's argument that the surveillance video footage "fits perfectly with what Danny Gayden told us. . . ." (TT: 621). He also faults the prosecutor for asking the jury rhetorically, "How else do we know that Danny Gayden was telling us

the truth and that Brian Smith was the shooter[?]" (TT: 625); (*see also* TT: 627 ("How else do we know that Danny Gayden was telling us the truth when he told us that Brian Smith was the shooter?")).

"Attorney statements vouching for the credibility of witnesses are generally improper because they 'impl[y] the existence of extraneous proof.'" *United States v. Perez*, 144 F.3d 204, 210 (2d Cir. 1998) (quoting *United States v. Rivera*, 22 F.3d 430, 438 (2d Cir.1994) (alteration in original)). Here, the prosecutor did not imply that he had "special knowledge of facts not before the jury." *Id.* Instead, he pointed to different items of evidence and argued how each one corroborated Gayden's testimony. (*See, e.g.*, TT: 625-28 (discussing the ballistics and forensic medical evidence)). Courts have held that this does not constitute improper vouching for a witness's credibility. *See, e.g., Perez*, 144 F.3d at 210 (no improper vouching where the prosecutor stated in regard to the law enforcement witnesses, "'I submit to you that they are reliable, you can trust their testimony. You can count on them. And there's some reasons why I say that to you[,]'" and "then discussed particular items of evidence in detail and argued that the evidence supported the officers' credibility"). Because the prosecutorial misconduct argument was quite weak, appellate counsel reasonably decided to omit. And since it had no reasonable probability of succeeding, appellate counsel's strategic decision to omit it did not prejudice Petitioner.

## III.    Ineffective Assistance of Trial Counsel (Grounds Six, Thirteen, and Fourteen)

Grounds Six, Thirteen, and Fourteen assert various claims concerning trial counsel's performance. Ground Six (Dkt. No. 1 at 9) includes the allegations raised in the second 440 motion (SR: 1174-1653)—that trial counsel (a) failed to use the recordings of

Allen and Gayden's jail phone calls for impeachment; (b) failed to investigate an unidentified witness's statement that Allen was trying to a sell a gun that was used in a homicide; (c) failed to cross-examine Allen using a cell phone bill showing calls between her phone and a phone number linked to Harris; and (d) failed to prevent the admission of prejudicial testimony from Gayden and Sergeant Mariano. The second 440 court rejected the ineffective assistance claims on procedural grounds and on the merits. (SR: 2047-49).

The ineffective assistance of counsel allegations in Ground Thirteen (failure to request a missing witness charge for Witness Number 3) and Ground Fourteen (opening the door to questioning about Petitioner's prior robbery) were raised on direct appeal in Petitioner's *pro se* supplemental appellate brief (SR: 413-16), and the Fourth Department denied them on the merits. *Smith*, 93 A.D.3d at 1346 ("We reject th[e] contention [of ineffective assistance of counsel] inasmuch as defendant failed to establish the absence of a strategic or other legitimate explanation for defense counsel's alleged shortcomings.").

Respondent has raised the affirmative defense of procedural default as to the allegations in Ground Six. (Dkt. No. 37 at 43-44). Alternatively, Respondent argues that the state courts reasonably applied *Strickland* in rejecting the ineffectiveness allegations in Grounds Six, Thirteen, and Fourteen. (*Id.* at 44-48). The Court agrees and recommends dismissing Grounds Six, Thirteen, and Fourteen as meritless.

## A.    Procedural Default

Where a state prisoner "has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule," *Coleman v. Thompson*, 501 U.S.

722, 750 (1991), a federal habeas review of the claims is barred." *Id.* When presented

with a procedural default argument based on the adequate and independent state ground

doctrine, the federal habeas court is responsible for first determining the "adequacy" of

the state procedural bar. *Garvey v. Duncan*, 485 F.3d 709, 714 (2d Cir. 2007) (citing *Lee*

*v. Kemna*, 534 U.S. 362, 375 (2002)). That is, the federal court must "ascertain whether

the state rule at issue is firmly established and regularly followed, and further whether

application of that rule in [a particular] case would be exorbitant." *Id.*

Respondent asserts that the claims in Ground Six challenging trial counsel's

performance are procedurally defaulted because the second 440 court relied on two

adequate and independent state grounds—C.P.L. §§ 440.10(2)(c) and 440.10(3)(c)—to

reject them. (Dkt. No. 37 at 36-37, 43-44 (referring to SR: 2047)). Respondent further

contends that Petitioner cannot overcome the procedural bar. (*Id.*).

The Supreme Court has observed that it is appropriate to bypass procedural

questions to reach the merits of a habeas petition if the underlying issues "are easily

resolvable against the habeas petitioner, whereas the procedural-bar issue involve[s]

complicated issues of state law." *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997). The

ineffective assistance allegations in Ground Six are clearly meritless, while Respondent's

assertion of procedural default presents a potentially complicated issue of state law. The

Court therefore will proceed directly to the substance of Ground Six. *See, e.g., Anderson*

*v. Graham*, No. 6:15-cv-06687-MAT, 2018 WL 1428249, at *2 (W.D.N.Y. Mar. 22, 2018)

(declining to "resolve the issues raised by [the r]espondent's assertion of the defenses of

non-exhaustion and procedural default" and proceeding to decide the claims on the

merits). Because the state courts did not unreasonably apply *Strickland* in rejecting the

allegations of ineffective assistance of trial counsel, the Court recommends dismissing Grounds Six, Thirteen, and Fourteen as meritless.

### B.     Merits

#### 1.     Legal Standard

Under *Strickland*'s two-pronged test for evaluating claims of ineffective assistance of trial counsel, the petitioner first must show that counsel's performance "fell below an objective standard of reasonableness" in light of "prevailing professional norms." 466 U.S. at 688. The Supreme Court has "often explained that [counsel's] strategic decisions . . . are entitled to a 'strong presumption' of reasonableness." *Dunn v. Reeves*, 141 S. Ct. 2405, 2410 (2021) (per curiam) (citing *Harrington*, 562 U.S. at 104). A reviewing court is "required not simply to 'give [the] attorneys the benefit of the doubt,' but to affirmatively entertain the range of possible 'reasons [the petitioner's] counsel may have had for proceeding as they did,'" *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011) (first alteration in original; citations omitted). "[T]he burden to 'show that counsel's performance was deficient' rests squarely on the [petitioner]," *Burt v. Titlow*, 571 U.S. 12, 22-23 (2013) (quoting *Strickland*, 466 U.S. at 687). "[T]he absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'" *Id.* at 23 (quoting *Strickland*, 466 U.S. at 689 (second alteration in original))

Second, the petitioner must show prejudice, meaning "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "That requires a 'substantial,' not

just 'conceivable,' likelihood of a different result." *Cullen*, 563 U.S. at 189 (quoting *Harrington*, 562 U.S. at 112).

### 2. Trial Counsel's Alleged Errors

#### a. Failure to Use Jail Phone Calls for Impeachment (Ground Six)

Petitioner faults trial counsel's approach to cross-examining Gayden and Allen, arguing that he should have impeached them with recordings of their telephone calls while Gayden was detained at the Monroe County Jail. According to Petitioner, the calls would have proven that when Gayden and Allen discussed having Allen sell a "thing," they were referring to the weapon used to shoot Harris. (SR: 1204-05).

"[T]he conduct of examination and cross-examination is entrusted to the judgment of the lawyer, and [a] [reviewing] court on a cold record should not second-guess such decisions unless there is no strategic or tactical justification for the course taken." *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998). Petitioner here simply disagrees with trial counsel's strategic approach to cross-examining Gayden and Allen about this topic. The Court notes that trial counsel specifically asked Gayden if the gun he and Allen discussed selling was the gun used to shoot Harris, but Gayden denied it. (TT: 326). Gayden said that the weapon he had Allen sell was a .44-caliber gun (TT: 368), but the proof at trial established that the gun used to shoot Harris was a .380-caliber pistol. (TT: 536).

Moreover, Petitioner has not shown how the actual phone call recordings would have established that the "thing" Gayden and Allen discussed actually was the .380-caliber gun used to shoot Harris. Therefore, he has not shown how the outcome of the

cross-examination would have been different had trial counsel used the call recordings and accordingly cannot demonstrate prejudice as a result of trial counsel's decision.

### b.    Failure to Investigate Witness Statement (Ground Six)

Petitioner contends that trial counsel should have hired an investigator to pursue a potential lead about a witness who was mentioned in an investigative action report authored by Investigator May:

> On the morning of Tuesday, November 8, I received a phone call from (V[ictim]) Harris'[s] mother, Emma Gibson. She advised me that she and her family had gone out on Saturday, November 5 to hang reward posters for information from the murder. She said she was on Miller St. at Bay St. and a young female black approached her. She described this girl as being approximately 5'5" – 5'6", medium complected, approx. 18-20 years old, with weaved hair in a pony tail [sic]. This female identified herself as T and said she stays with Octavia Allen, the girlfriend of Danny Gayden. According to Gibson, this girl told her that Octavia is attempting to sell the gun for bail money to get Danny Gayden out of jail. She is having difficulty selling it though because the gun "has a body on it." Gibson said she tried to get the girl[']s name or at least a phone number but the girl refused.

(SR: 1456).

Petitioner assumes, without any factual support, trial counsel did not investigate the lead about "T." Even assuming that trial counsel did not investigate this notation about "T.," "a petitioner does not show that he was prejudiced by trial counsel's alleged deficient performance merely by asserting that certain witnesses might have supplied relevant testimony; rather, he must state exactly what testimony they would have supplied and how such testimony would have changed the result." *Carr v. Senkowski*, No. 01-CV-689, 2007 WL 3124624, at *20 (W.D.N.Y. Oct. 23, 2007) (citing, *inter alia*, *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)). "[I]n order for the [petitioner] to demonstrate the requisite *Strickland* prejudice, the [petitioner] must show not only that this testimony

would have been favorable, but also that the witness would have testified at trial." *Id.* at *22 (citing *Alexander*, 775 F.2d at 602).

As the second 440 court observed in denying this "conclusory" claim, "[t]here [were] no affidavits from any potential witnesses submitted" in support of the motion. (SR: 2048). Petitioner therefore has not shown that "T.", in fact, would have testified at trial and would have provided testimony favorable to the defense. Accordingly, even assuming that trial counsel did not investigate "T.", Petitioner cannot show any prejudice to his defense as a result of trial counsel's failure to call her as a witness. *See Carr*, 2007 WL 3124624, at *22; *see also Sturdivant v. Barkley*, No. 04-CV-5659 (DLI), 2007 WL 2126093, at *7 (E.D.N.Y. July 24, 2007) ("[P]etitioner gives no indication as to which witnesses counsel should have presented, much less how any of these unidentified individuals would have changed the result of the proceeding. As such, petitioner's self-serving and conclusory allegation that defense counsel failed to present witnesses is insufficient to establish ineffective assistance of counsel.").

**c.    Failure to Cross-Examine Allen Using Cell Phone Bill (Ground Six)**

Petitioner asserts that trial counsel erred by failing to cross-examine Allen about a phone bill seized during the execution of a search warrant on Gayden's drug house. The phone bill in question revealed eleven calls between a landline in Allen's household and a telephone number that had been "reported to [Investigator May] as being (V) Harris' cell phone number." (SR: 1462, 1592-96). The date-range for the phone calls begins September 30, 2005, the day before Harris's death; it ends on October 6, 2005, four days after his death. (SR: 1595-96). The calls, in total, lasted fourteen billed minutes. Only five

minutes of the calls occurred prior to Harris's death (SR: 1595), and the two longest calls (two and three minutes, respectively) post-date Harris's time of death. (SR: 1596).

Petitioner argues that the phone bill was "crucial" to his defense because it "corroborated [his] assertion to trial counsel as it related to Gayden and Allen's motive to frame [him]" for Harris's death. (SR: 1210). Petitioner explains that he informed counsel that he had told Gayden that Allen was rumored to be "sleeping with someone that hangs out around the Saratoga area," that "Harris was alleged to be from that area," and that "presumably after [Gayden] confront[ed] [Allen] about that, she accused [Petitioner] of sleeping with her, or trying to sleep with her; which created animosity between [Petitioner] and Gayden." (SR: 1210). According to Petitioner, this explains why Gayden inculpated him in the shooting. (*See id.*).

Petitioner's argument regarding the probative value of the phone bill rests on nothing more than speculative assertions and improbable inferences. "[F]ederal district courts cannot grant habeas relief based upon unsubstantiated surmise, opinion or speculation." *Gillis v. Edwards*, 445 F. Supp. 2d 221, 235 (N.D.N.Y. 2006) (citing *Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (stating that federal courts may not grant "habeas relief on the basis of little more than speculation with slight support")). Petitioner has not established that the phone bill would have had any conceivable effect on the verdict, and therefore cannot show that trial counsel's failure to introduce it prejudiced the defense.

### d. Failure to Prevent Admission of Improper Evidence (Ground Six)

Petitioner faults trial counsel for failing to prevent admission of the testimony from Gayden and Sergeant Mariano regarding his unsuccessful attempt to obtain the surveillance camera footage and his destruction of the sidewalk memorial to Harris.

Petitioner contends that the allegations could have been "unquestionably refuted" by having a defense investigator retrieve the surveillance camera video footage from the day in question. (SR: 1211-12).

Failure to conduct an adequate pre-trial investigation may serve as the basis for a claim of ineffective assistance of counsel, *see Strickland*, 466 U.S. at 690-91, but "a petitioner must do more than make vague, conclusory, or speculative claims as to what evidence could have been produced by further investigation." *Taylor v. Poole*, No. 07 CIV 6318 RJH GWG, 2009 WL 2634724, at *14 (S.D.N.Y. Aug. 27, 2009), *report and recommendation adopted*, No. 07 CIV. 6318 RJH GWG, 2011 WL 3809887 (S.D.N.Y. Aug. 26, 2011) (collecting cases). Petitioner has not substantiated his complaint about the purportedly inadequate investigation with, for instance, an affidavit from trial counsel indicating that he did not attempt to retrieve the footage or an affidavit from the store employees saying that no one from the defense team inquired about the footage. It is entirely possible that defense counsel tried to obtain the footage but was unable to do so. Petitioner's claim thus rests on mere speculation, which is insufficient to show deficient performance or prejudice. *See, e.g.*, *Rosario v. Bennett*, No. 01 CIV. 7142(RMB)(AJ[P]), 2002 WL 31852827, at *33 (S.D.N.Y. Dec. 20, 2002) (rejecting failure-to-investigate claim where petitioner did "nothing but assert than investigation might have revealed witnesses who might have supplied relevant testimony that might have been exculpatory"); *McPherson v. Greiner*, No. 02 CIV.2726 DLC AJP, 2003 WL 22405449, at *25 (S.D.N.Y. Oct. 22, 2003) (rejecting failure-to-investigate claim as speculative where there was "no way to know that trial counsel did not consider investigating these claims [of exculpatory evidence] but simply rejected them as being unpromising").

Petitioner also contends that trial counsel should have objected to the evidence or sought an advance ruling to have it precluded under the *Molineux* rule. "In considering the reasonableness of counsel's failure to object, [courts] 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,'" *Cox v. Donnelly*, 387 F.3d 193, 198 (2d Cir. 2004) (quoting *Strickland*, 466 U.S. at 689), and "'might be considered sound strategy.'" *Id.* (quoting *Strickland*, 466 U.S. at 689). With regard to trial counsel's failure to "prevent" the admission of the testimony from Gayden and Sergeant Mariano, Petitioner has not demonstrated that there was a meritorious objection that counsel could have made.

The *Molineux* rule states that "evidence of a defendant's uncharged crimes or prior misconduct is not admissible if it cannot logically be connected to some specific material issue in the case, and tends *only to demonstrate the defendant's propensity to commit the crime charged*." *People v. Cass*, 18 N.Y.3d 553, 559 (2012) (emphasis supplied). Although the *Molineux* rule generally encompasses only *prior* crimes and *prior* bad acts, the Court will assume for the sake of argument that the testimony at issue here potentially could fall within the rule's ambit.

Trial counsel reasonably could have determined that Gayden's testimony regarding Petitioner's attempt to retrieve the surveillance video was relevant to show consciousness of guilt and thus admissible. *See People v. Person*, 26 A.D.3d 292, 294 (1st Dep't 2006) (holding that the trial court "properly admitted testimony that defendant directed the accomplice to remove traces of evidence from the victim's apartment, and to kill a doorman who had seen him, since this evinced defendant's consciousness of guilt," and "properly balanced the probative value of the evidence against the potential for undue

prejudice"); *People v. Cotton*, 184 A.D.3d 1145, 1146 (4th Dep't 2020) (stating that "evidence that defendant may have damaged the victim's electronic devices to prevent her from preserving a record of defendant's conduct is probative of his consciousness of guilt inasmuch as it is akin to evidence of tampering or witness intimidation"). "Consciousness of guilt has been found to be a valid exception to the *Molineux* rule." *People v. C.H.*, 51 Misc. 3d 1230(A) (N.Y. Sup. Ct. 2016) (citing *People v. Brown*, 239 A.D.2d 429 (2d Dep't 1997)).

Similarly, trial counsel reasonably could have determined that Gayden's testimony was relevant to the issue of "identity," the most critical issue in the case. It would be reasonable to infer that only the person responsible for Harris's death would be motivated to destroy a memorial to him, particularly after that person had unsuccessfully attempted to obtain the videotape potentially identifying him as the shooter. "Identity" is one of the enumerated *Molineux* exceptions. *See Molineux*, 168 N.Y. at 293. Moreover, the evidence fell within the *Molineux* exception stating that "evidence may be admissible as 'necessary background material when relevant to a contested issue in the case . . . or to complete the narrative of the events.'" *People v. Woody*, 214 A.D.3d 157, 161 (1st Dep't 2023) (quoting *People v. Foster*, 295 A.D.2d 110, 112 (1st Dep't 2002) (ellipsis in original; internal citations omitted in original)). "This exception is generally applicable where there is . . . some need to flesh out the narrative so that there are no gaps in the story line provided to the jury." *People v. Leonard*, 29 N.Y.3d 1, 8 (2017).

Sergeant Mariano's testimony about Petitioner's head-nod upon hearing that the police knew about this conduct arguably could be characterized as an adoptive admission. *See People v. Vining*, 28 N.Y.3d 686, 690 (2017) ("An adoptive admission

occurs 'when a party acknowledges and assents to something "already uttered by another person, which thus becomes effectively the party's own admission."'") (emphasis and citation omitted); *see also People v. Speller*, 121 Misc. 2d 354, 355 (N.Y. Sup. Ct. 1983) ("An admission, in addition to being oral, may take the form of any act on defendant's part which tends to convey his thought processes." (citing *Schmerber v. California*, 384 U.S. 757, 761 n.5 (1966) ("A nod or headshake is as much a 'testimonial' or 'communicative' act in this sense as are spoken words.")).

It is well settled that "[f]ailure to make a meritless argument does not amount to ineffective assistance." *United States v. Arena*, 180 F.3d 380, 396 (2d Cir.1999). Given this legal backdrop, trial counsel reasonably could have concluded that any objection to Gayden's or Sergeant Mariano's testimony on *Molineux* or other grounds was unlikely to be successful. Petitioner has not overcome the presumption that counsel's decision not to object reasonable; nor has he demonstrated that he was prejudiced thereby.

### e.    Failure to Request a Missing Witness Charge for Witness Number 3 (Ground Thirteen)

Petitioner asserts that trial counsel was ineffective for failing to request a missing witness charge as to the individual identified as Witness Number 3 at the *Wade* hearing. During his opening, trial counsel referred to this witness as Charlene Beasley ("Beasley"), telling the jury that they might hear she identified Petitioner as the shooter. (TT: 180). He cautioned the jury to view any testimony from Beasley with suspicion because she earlier had identified Gayden as the shooter and because she was a drug-addicted prostitute with a lengthy criminal record. (TT: 180-81). The prosecution did not call Beasley, and trial counsel did not request a missing witness charge or mention her absence during his closing.

After preemptively arguing that the jurors should reject anything Beasley said as unreliable and incredible, trial counsel reasonably could have decided that the prosecution's decision not to call her was a boon to the defense. Furthermore, requesting a missing witness charge would have allowed the prosecution to call her as a rebuttal witness. *See Arena v. Kaplan*, 952 F. Supp. 2d 468, 489–90 (E.D.N.Y. 2013) (finding trial counsel's decision not to request a missing witness charge as to Caramelli was reasonable where, if trial counsel had done so, the prosecution might have called Caramelli, and his "testimony would have buttressed" another prosecution witness's testimony and the petitioner's confession to the murder (citing *People v. Peake*, 14 A.D.3d 936, 936 (3d Dep't 2005) ("[I]f defense counsel had made a timely request for . . . a [missing witness] charge [as to Berger], then the prosecution might have offered Berger as a limited rebuttal witness to buttress the prosecution's earlier, effective cross-examination of Severinghaus.")). As noted above, Investigator May testified at the *Wade* hearing that Witness Number 3 explained her initial failure to identify Petitioner was due to fear of retaliation by members of a drug gang. Since requesting a missing witness charge carried a degree of risk, Petitioner has not overcome the presumption that declining to request a missing witness charge as to Beasley was a reasonable strategic decision.

### f.    "Opening the Door" to a Prior Crime (Ground Fourteen)

Petitioner faults trial counsel for telling the jury during his opening argument that Petitioner had committed a robbery:

> Danny Gayden, you will find from the testimony, was a friend of Brian Smith, an associate. They did some things together. They sold drugs together, and they, on at least one occasion, committed a robbery together.
> . . .

>As that case was pending, and as Danny Gayden faced up to twenty-five years in prison, several months after this homicide, Danny Gayden decided, if I offer Brian Smith to be the shooter in this case and they go for it, I, number one, don't get charged with it. You will find from the proof in this case that Danny was the prime suspect in this shooting from October 2nd until sometime in January when he came forward with his attorney to the District Attorney's Office to say, you know what, Brian Smith did this. In exchange for that, rather than go to prison for a minimum of five years to a maximum of twenty-five years, they gave him a free pass, a get out of jail, virtually a [sic] free card on that robbery, and no prosecution on the homicide.

(TT: 178-79). Trial counsel's remark about the robbery, viewed in context, clearly was part of a coherent strategy to undermine Gayden's credibility by showing he had a strong motive to lie—avoiding prosecution for Harris's death and reducing his sentencing exposure in other matters. Petitioner has not overcome the presumption that this was a sound strategy.

To show prejudice, Petitioner asserts that trial counsel's comments about the robbery caused him not to exercise his right to testify. He suggests that but for counsel's blunder, he would have taken the stand and convinced the jury of his innocence. However, the trial court's *Sandoval* ruling ensured that if Petitioner testified, the jury would learn he had two felony convictions of an unspecified nature and a conviction for possessing stolen property. Petitioner has not demonstrated that trial counsel's mention of the robbery had an effect on his decision whether to testify or on the outcome of the trial.

## IV.    Newly Discovered Evidence (Ground Seven)

Petitioner asserts that Gayden's recantation is newly discovered evidence that would have changed the outcome of his trial. (Dkt. No. 1 at 10 ¶ 22(G)). In state court, Petitioner brought his newly discovered evidence under C.P.L. § 440.10(1)(g). This

section provides, in pertinent part, that a trial court may vacate a defendant's conviction when

> [n]ew evidence has been [1] discovered since the entry of a judgment based upon a verdict of guilty after trial, [2] which could not have been produced by the defendant at the trial even with due diligence on his part and [3] which is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant.

N.Y. Crim. Proc. Law § 440.10(1)(g). In addition to the three elements identified in the statute itself, the newly discovered evidence also "must be material to the issue, . . . it must not be cumulative to the former issue, and . . . it must not be merely impeaching or contradicting the former evidence." *People v. Salemi*, 309 N.Y. 208, 216 (1955).

As a matter of New York state law, "[t]he authority to an order for a new trial on the ground of newly discovered evidence is *purely statutory* and may be exercised only when the requirements of that statute have been satisfied to the determination of the trial court." *People v. Turner*, No. 396/2018, 2023 WL 2721707, at *10 (N.Y. Sup. Ct. Mar. 30, 2023) (emphasis supplied) (citing *Salemi*, 309 N.Y. at 215). Thus, as interpreted by the New York Court of Appeals, C.P.L. § 440.10(1)(g) does not require a defendant to prove that a constitutional violation occurred at his trial in order to obtain relief based on newly discovered evidence.

In federal court, however, "'newly discovered evidence only warrants habeas relief where it bears on the constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state petitioner is not a ground for relief on federal habeas corpus.'" *Balkman v. Poole*, 725 F. Supp. 2d 370, 375 (W.D.N.Y. 2010) (quoting *Mapp v. Clement*, 451 F. Supp. 505, 511 (S.D.N.Y. 1978)). Thus, to the extent Petitioner contends that the second 440 court erroneously applied New York state

law interpreting in denying his newly discovered evidence claim, such a claim is not cognizable on federal habeas review, and the Court recommends denying it on this basis.

Mindful of the obligation to construe the *pro se* petition leniently, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007), the Court has considered whether a due process violation occurred at Petitioner's trial relative to the newly discovered evidence. The prosecution's use of perjured testimony can violate due process, but only where "'the prosecution knew, or should have known, of the perjury,' and 'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Drake v. Portuondo*, 321 F.3d 338, 345 (2d Cir. 2003) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976) (footnote omitted in original)).

Because Gayden did not write his recantation until over a decade after Petitioner's trial, there is no evidence that the prosecutor knew or should have known that Gayden testified falsely at trial. The prosecution's lack of actual or constructive knowledge "alone is sufficient reason to reject [a perjury] claim." *Dansby v. United States*, 291 F. Supp. 790, 793-94 & n.11 (S.D.N.Y. 1968) (citing *Beavers v. United States*, 351 F.2d 507, 508 (9th Cir. 1965); *United States v. Mauriello*, 289 F.2d 725, 725 (2d Cir. 1961) (per curiam)).

Moreover, Petitioner has not carried his burden of establishing that Gayden actually committed perjury. *See, e.g.*, *United States v. Mangano*, No. 16-CR-540 (JMA), 2022 WL 65775, at *60 (E.D.N.Y. Jan. 6, 2022) ("[T]o establish that the [recanting] witness testified falsely at trial, a defendant has the burden to establish, based on all the relevant evidence, that the witness gave false testimony at trial." (citing, *inter alia*, *United States v. Lespier*, 266 F. App'x 5, 7 (2d Cir. 2008) (unpublished opn.); *see also Dansby*, 291 F. Supp. at 793 (stating that the petitioner "has the burden of establishing that the testimony

was perjured"). In determining whether perjury occurred, a court must "weigh all the evidence of perjury before it." *See Ortega v. Duncan*, 333 F.3d 102, 106-07 (2d Cir. 2003).

Petitioner's chief evidence of perjury is Gayden's recantation and Gayden's hearing testimony stating he lied at trial about seeing Petitioner shoot Harris. The second 440 court roundly dismissed both as unreliable. (SR: 2050). It is well settled that "[c]redibility determinations are properly within the province of the state court that presided over the trial and evidentiary hearing." *Shabazz v. Artuz*, 336 F.3d 154, 163 (2d Cir. 2003). The presumption of correctness in 28 U.S.C. § 2254(e)(1) "is particularly important when reviewing the trial court's assessment of witness credibility." *Cotto v. Herbert*, 331 F.3d 217, 233 (2d Cir. 2003).

The second 440 court considered several factors in assessing Gayden's credibility, including the "inherent believability" of his hearing testimony, his demeanor, his reasons for testifying at trial and later recanting, his relationship with Petitioner, and his motive to lie. (SR: 2050). After considering those factors, the second 440 court did "not credit the testimony provided by Danny Gayden at the hearing." (*Id.*). Significantly, the second 440 court noted, Gayden had been a "lifelong friend" of Petitioner. Gayden also was "unable to recall who were the mutual friends he discussed signing the recantation affidavit for or where it occurred or when." (*Id.*). Finding Gayden's "'explanation' that he wanted to wait until he was out of prison before bringing this to anyone's attention [to be] specious," the second 440 court also questioned why he "wait[ed] for over two years before he produced this document after being released [from prison]." (*Id.*). The second 440 court found that Gayden's "lone statement" that "he lied at trial and is now telling the truth is completely unreliable." (*Id.*).

Petitioner has not come forward with any evidence, let alone clear and convincing evidence, to rebut the presumption of correctness owed to the second 440 court's factual findings. Further, the record amply supports its determination of unreliability. At the second 440 hearing, Gayden admitted that he testified truthfully about going to the corner store on Miller Street with Petitioner on the night of the shooting. (SR: 1993-94).[10] Inexplicably, however, Gayden's hearing testimony and recantation offer no clue about what he actually observed. Contrary to Petitioner's contention that "much of the recantation" is "either support[ed] by common sense, or independently verifiable" (SR: 1234), the complete lack of *any* details from Gayden makes independent verification of his affidavit impossible.

Similarly, Gayden's hearing testimony about how he came to write the recantation was exceptionally vague. Indeed, none of his testimony on that topic is independently verifiable, as demonstrated by the following colloquy at the hearing:

| | |
|---|---|
| THE COURT: | You told [the prosecutor] that at some point you had told mutual friends that you were going to sign this affidavit. These are mutual friends of who? |
| [GAYDEN]: | Well, it's more my friends that, you know, knew about the situation. |
| THE COURT: | You said mutual friends, so mutual friends of who? |
| [GAYDEN]: | Everyone that grew up with us in our neighborhood. |
| THE COURT: | You grew up with Mr. Smith in that same neighborhood? |
| [GAYDEN]: | Yes. |
| THE COURT: | So who exactly was it that you told that you were going to sign this affidavit? |
| [GAYDEN]: | I don't remember everyone individually. |
| THE COURT: | Give me as many names as you do remember. |
| [GAYDEN]: | I don't remember them. I just remember pulling up and letting everybody know I'm -- |

---

[10] At the hearing, Gayden confirmed that he and Petitioner had gone to the corner store on October 2, 2005, but he recalled walking there and did not remember testifying that either of them was riding a bike. (SR: 1993-94, 1995). He acknowledged his testimony about seeking Harris but claimed he did not remember seeing Harris at the store and did not even know who Harris was. (SR: 1993).

| COURT: | Pulling up where? |
|--------|-------------------|
| [GAYDEN]: | In our neighborhood. |
| THE COURT: | No specific address? |
| [GAYDEN]: | No, there isn't a specific address. |
| THE COURT: | What time of day was this, day, night, did you check the time? |
| [GAYDEN]: | Day. I didn't check the time. |

(SR: 2008-09). Petitioner has not come forward with any evidence to rebut the presumption of correctness accorded to the second 440 court's decision not to credit Gayden's recantation and hearing testimony. Furthermore, "[g]iven the extremely narrow scope of [habeas] review," *Cotto*, 331 F.3d at 217, the Court cannot find that the second 440 court's rejection of Gayden's recantation as unreliable was an "unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(2).

As Petitioner points out, the Second Circuit has stated that a recantation's "lack of veracity cannot, in and of itself, establish whether testimony given at trial was in fact truthful." *Ortega*, 333 F.3d at 107. The second 440 court did not explicitly determine whether Gayden perjured himself at trial. It did, however, reject all of Gayden's hearing testimony, including his statement that he lied at trial about seeing Petitioner shoot Harris. Arguably, the second 440 court made an implicit finding that Gayden did not commit perjury. But even assuming that there is no factual determination by the second 440 court to which this Court owes deference under 28 U.S.C. § 2254(d)(2) and (e)(1), Petitioner has failed to establish that Gayden perjured himself.

Apart from the recantation, which the second 440 court justifiably found was unreliable, Petitioner offers no evidence showing that Gayden was lying when he testified at Petitioner's trial. He simply rehashes the arguments challenging the credibility of the prosecution's witnesses; however, the jury considered these arguments and rejected

them. Moreover, the inconsistencies between Gayden and Allen's trial testimony do not establish that Gayden testified falsely. Courts have repeatedly held that "even a direct conflict in testimony does not in itself constitute perjury." *United States v. Gambino*, 59 F.3d 353, 365 (2d Cir. 1995); *see also United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001) ("A witness commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory. Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury." (internal citations omitted)). The inconsistencies here concerned minor matters, such as whether Petitioner walked or drove to Allen's house on the morning after the shooting. (TT: 601-02). Defense counsel highlighted those inconsistencies during his closing argument and argued that the jury could not believe both Allen and Gayden. (TT: 602). But, as the prosecutor argued to the jury during his summation, Gayden consistently told the same story on direct and cross-examination about the material questions in the case—"what led up to the shooting and the shooting itself and who did the shooting." (TT: 622).

Petitioner has not overcome the presumption of correctness owed to the second 440 court's factual findings or shown that the second 440 court unreasonably determined the facts in concluding that Gayden's recantation was unreliable. Nor has Petitioner established that Gayden committed perjury at trial, and therefore he has not shown that a constitutional error occurred in connection with his newly discovered evidence claim. Accordingly, the Court recommends denying relief on Ground Seven.

**V.    Actual Innocence (Ground Eight)**

Petitioner contends that he is entitled to habeas relief because "[a]ll the evidence" he presented to the state courts establishes his actual innocence. (Dkt. No. 1 at ¶ 22(H)). Respondent asserts that a freestanding claim of actual innocence is not cognizable as a basis for substantive relief in a federal habeas proceeding. (Dkt. No. 37 at 49). The Court agrees, and further concludes that even if such a claim were cognizable, Petitioner's allegations do not show he is actually, factually innocent.

Although the Supreme Court has determined that a federal habeas petitioner may assert a "gateway claim" of actual innocence to overcome the procedural default of a constitutional claim, *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013); or to equitably toll AEDPA's statute of limitations, *id.*, it has not resolved whether a non-capital prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence, *id.* at 392.

Assuming for the sake of argument that a freestanding actual innocence claim is cognizable in a 28 U.S.C. § 2254 proceeding brought by a non-capital prisoner, the Supreme Court has suggested that the required showing would be even higher than the demanding standard in *Schlup v. Delo*, 513 U.S. 298 (1995), for gateway actual innocence claims. *See House v. Bell*, 547 U.S. 518, 555 (2006) ("The sequence of the [Supreme] Court's decisions in *Herrera* and *Schlup*—first leaving unresolved the status of freestanding claims and then establishing the gateway standard—implies at the least that *Herrera* requires more convincing proof of innocence than *Schlup*.").

To meet the *Schlup* gateway standard, an actual innocence claim must be "credible," meaning that the petitioner has supported it by "new reliable evidence— whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical

physical evidence—that was not presented at trial." 513 U.S. at 324. The claim also must be "compelling," which requires the petitioner to demonstrate that "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538. "The fact that new evidence is credible does not necessarily make it compelling under the *Schlup* standard for actual innocence." *Hyman v. Brown*, 927 F.3d 639, 662 (2d Cir. 2019).

Petitioner's chief evidence of actual innocence is Gayden's recantation (SR: 1600). Since the jury did not hear this evidence, it is "new" for purposes of the *Schlup* analysis. Nevertheless, as discussed above in connection with Ground Seven, Petitioner has not established that it is also "reliable" and therefore sufficiently "credible" to meet the first prong of the *Schlup* standard.

Next, Petitioner argues that he is actually innocent because of inconsistencies in some of the testimony offered by Allen and Gayden. Such evidence cannot be considered "new" because the jury already heard and evaluated the alleged testimonial inconsistencies. *See Rivas v. Fischer*, 687 F.3d 514, 543 (2d Cir. 2012) (explaining that "new" reliable evidence under *Schlup* is "evidence not heard by the jury"). Moreover, the jury is exclusively responsible for determining the credibility of the witnesses and resolving any inconsistencies in their testimony. *See, e.g., Bossett v. Walker*, 41 F.3d 825, 830 (2d Cir. 1994) ("[A] conviction may be based upon circumstantial evidence and inferences based upon the evidence, and the jury is exclusively responsible for determining a witness'[s] credibility." (quoting *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993)). "[T]he fact that the jury may have chosen to credit less reliable aspects of

the testimony of [Gayden and Allen], or to resolve inconsistencies in their testimony in favor of the prosecution, does not undermine the reliability of the jury's verdict." *Simmons v. McGinnis*, No. 04 CIV. 6150 PACDF, 2006 WL 3746739, at *11 (S.D.N.Y. Dec. 19, 2006) (citing *Bossett*, 41 F.3d at 830). Moreover, even assuming *arguendo* that the alleged testimonial inconsistencies could be construed as a due process claim of legally insufficient evidence, that still would be inadequate. The Supreme Court has clearly stated that actual innocence means "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 624 (1998).

Petitioner also points to Allen's status as a paid informant as evidence of actual innocence. Such evidence is "new," as it did not become known until after the verdict. Even assuming it meets the "credible" prong of *Schlup*, it is not "compelling." As discussed above in connection with the *Brady* claim, two state courts and now this Court have concluded that Allen's status as a paid informant was not "material." It necessarily follows that this impeachment evidence does not indicate Petitioner's actual, factual innocence, much less do so compellingly. *See Holley v. Uhler*, No. 16-CV-215 (JMA), 2018 WL 9539157, at *12 (E.D.N.Y. Aug. 1, 2018) (finding that habeas petitioner's actual innocence claim "fail[ed] as the *Schlup* standard is undoubtedly higher than the materiality standard for *Brady* claims," and the district court had "already concluded that the *Brady* claim [was] not viable"); *cf. Hyman*, 927 F.3d at 664-65 (new evidence establishing that a witness did not see shootout and "thus, lied in identifying Hyman as a participant[,]" was "credible" but not "compelling" because the witness's "failure to see the shootout means she cannot inculpate [Hyman] (or anyone else), but neither can she exonerate him").

Lastly, Petitioner relies on three items of "documentary evidence" that trial counsel failed to use, i.e., a phone bill allegedly showing calls between Allen's house and a cell phone allegedly belonging to Harris, jail recordings of phone calls between Allen and Gayden in which they discussed selling a "thing," and an RPD investigative action report saying that a women identified only as "T." told Harris's mother that Allen was trying to sell a gun that had been used in a homicide. None of these items of evidence, even viewed in the light most favorable to Petitioner, compellingly indicate his innocence.

As to the phone bill, even assuming Harris was in contact with Allen, that does not mean Petitioner did not shoot or could not have shot Harris. With regard to the jail phone calls, Petitioner has supplied no proof that the "thing" referenced by Allen and Gayden during their conversations was the gun used to shoot Harris. Petitioner similarly has not established that the gun which "T." said Allen was trying to sell was the same gun used to shoot Harris. But even assuming Gayden and Allen or "T." were talking about the murder weapon, that does not mean that Petitioner did not shoot, or could not have shot, Harris. Therefore, none of the items of so-called "documentary evidence" is "compelling" under *Schlup*. *See Hyman*, 927 F.3d at 665 (finding that new evidence was not compelling, even though it left the trial record with no eyewitness identification of the petitioner as the gun-man; explaining that "the absence of such evidence does not mean that Hyman did not, or could not, have participated in the shootout" but "means only that Ellis does not know who, if anyone, did"). Because Petitioner cannot meet the demanding *Schlup* standard for a gateway claim of actual innocence, he necessarily cannot meet the more demanding hypothetical standard that the Supreme Court has said a freestanding

claim of actual innocence would entail. Accordingly, the Court recommends denying relief on Ground Eight.

## VII.    Weight of the Evidence (Grounds Nine and Twelve)

Petitioner asserts that manslaughter verdict was against the weight of the evidence. (*See* Dkt. No. 1 at 10 ¶ 22(I); *id.* at 11 ¶ 22(L). More specifically, Petitioner urges that the jury should have determined that Gayden was the shooter because Gayden had gotten into a fight with Harris and his friends earlier that night and because defense witness Conley testified that Gayden told her that he was going to "get" the person who hit him with a bottle. (*Id.* at 10 ¶ 22(I)). He also asserts that Allen and Gayden were not credible witnesses due to the inconsistencies in their testimony. (*Id.* at 11 ¶ 22(L). The Appellate Division held that "affording appropriate deference to the jury's credibility determinations, . . . the verdict is not against the weight of the evidence." *Smith*, 93 A.D.3d at 1346.

A claim that a verdict is against the weight of the evidence derives solely from a statutory provision, C.P.L. § 470.15(5), which invests intermediate appellate courts with a unique factual review power to "weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony[.]" *People v. Bleakley*, 69 N.Y.2d 490, 495 (1987) (internal quotation marks and citations omitted). Since "federal habeas corpus relief does not lie for errors of state law," *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990), courts in this Circuit routinely have dismissed "weight of the evidence" arguments as not cognizable on habeas corpus review. *See, e.g., Correa v. Duncan*, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001) (cited with approval in

*McKinnon v. Sup't, Great Meadow Corr. Facility*, 422 F. App'x 69, 75 (2d Cir. 2011)). The Court accordingly recommends dismissing Grounds Nine and Twelve on this basis.

## VIII.    Erroneous Admission of *Molineux* Evidence (Ground Ten)

Petitioner asserts that the trial court erroneously admitted testimony concerning his defilement of the sidewalk memorial. (Dkt. No. 1 at 10 ¶ 22(J)). On appeal, the Fourth Department found that the contention was unpreserved for appellate review and declined to review it as a matter of discretion in the interest of justice. *Smith*, 93 A.D.3d at 1346.

### A.    Exhaustion and Procedural Default

Respondent contends that the *Molineux* claim is unexhausted because appellate counsel framed it solely as a violation of state evidentiary. (Dkt. No. 37 at 50-51). Respondent also asserts that state procedural rules bar Petitioner from exhausting the claim and therefore the Court must deem the claim exhausted but procedurally defaulted. (*Id.* at 51). Respondent further argues that Petitioner cannot demonstrate cause for, or prejudice from, the procedural default, or that there will be a fundamental miscarriage of justice if this Court declines to consider the claim. (*Id.*). Alternatively, Respondent contends, Ground Ten presents only an issue of state law that is not cognizable on habeas review and that is, in any event, meritless. (*Id.* at 51-52).

Because the Court readily may deny this evidentiary claim, it will bypass the issues of exhaustion and procedural default. *See, e.g., Lendof-Gonzalez v. Johnson,* No. 20-CV-06924-FPG, 2021 WL 1373930, at *6 (W.D.N.Y. Apr. 12, 2021) (exercising discretion to bypass the issues of exhaustion and procedural default where claims could be "readily dismissed on alternative grounds").

"A decision to admit evidence of a criminal defendant's uncharged crimes or bad acts under *Molineux* constitutes an evidentiary ruling based on state law." *Jones v. Conway*, No. 09–CV–6045 (MAT), 2011 WL 1356751, at *2 (W.D.N.Y. Apr. 4, 2011). In general, however, habeas courts refrain from "reexamin[ing] state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see also* 28 U.S.C. § 2254(a). To be cognizable on federal habeas review, a "claim asserting a right to relief on *Molineux* grounds must rise to the level of constitutional violation." *Roldan v. Artuz*, 78 F. Supp. 2d 260, 276 (S.D.N.Y. 2000) (collecting cases). That is, the erroneously admitted evidence "must have been 'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'" *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998) (quoting *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992)).

Even assuming the evidence regarding Petitioner's behavior at the memorial was admitted in error, it was not sufficiently material to have provided an independent basis to convict him. The fact that Petitioner vandalized the memorial to Harris did not demonstrate that Petitioner had a propensity to shoot people, let alone directly attribute the shooting to Petitioner. Furthermore, that evidence did not remove a reasonable doubt regarding his guilt that otherwise would have existed. The jury had before it ample evidence on which to find that the prosecution satisfied its burden of proving, beyond a reasonable doubt, that Petitioner shot Harris. As discussed above, Gayden's eyewitness testimony was corroborated by other, properly admitted evidence, including the surveillance camera videotape and the ballistics evidence. Thus, even if the evidence was erroneously admitted under *Molineux*, it did not amount to a due process violation.

*See Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992) (finding that erroneously admitted evidence was not sufficiently material to violate due process where "apart from the challenged evidence . . . , the prosecution presented highly probative evidence of [the defendant's] guilt"); *Collins*, 755 F.2d at 19 (finding that the erroneously admitted evidence was not sufficiently material to violate due process where it "did not directly attribute to [the defendant] the commission of the crime charged" and where other "properly admitted evidence against [the defendant] was very strong"). Because Petitioner has not shown that an evidentiary error of constitutional magnitude occurred at his trial, the Court recommends dismissing Ground Ten.

## VII.    Impairment of Right to Challenge Identifications (Ground Eleven)

In Ground Eleven, Petitioner asserts that the trial court's grant of the prosecutor's *ex parte* request for a protective order deprived him of his right to demonstrate the undue suggestiveness of the identification procedures involving Witness Number 3. More specifically, Petitioner argues, as he did on direct appeal, that he was deprived of his right to fully cross-examine Investigator May at the *Wade* hearing and "to demonstrate that Danny Gayden was positively identified as the shooter three (3) days after the crime took place by 'Witness #3' (Ms. Charlene Beasley)." (SR: 407). The Fourth Department held that the claim was "moot because that witness never testified at trial." *Smith*, 93 A.D.3d at 1346.

Respondent argues that Petitioner is not entitled to habeas relief because the Fourth Department correctly concluded that the claim was moot. (Dkt. No. 37 at 53-54). As a matter of New York State law, the remedy for a defendant who successfully argues that prospective in-court testimony should have been suppressed is reversal of the trial

court's suppression ruling. *See, e.g., People v. Townsley*, 240 A.D.2d 955, 957 (3d Dep't 1997), *rev'd on other grounds, People v. Smith*, 33 N.Y.3d 454 (2019). Where, as here, the identifying witness does not make an in-court identification of the defendant, any *Wade* violation is mooted. *See id.* (rejecting as moot defendant's contention that the trial court erred by failing to suppress a witness's prospective in-court identification testimony; the prosecution's decision not to call the witness at trial meant that reversal of the suppression ruling would have no effect on defendant's rights). "The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed." *Martin-Trigona v. Shiff*, 702 F.2d 380, 386 (2d Cir. 1983). Thus, as Respondent argues, this claim is moot.

Moreover, Petitioner has not demonstrated a violation of his federal constitutional rights. "On a petition for a writ of federal habeas corpus, the petitioner bears the burden of proving by a preponderance of the evidence that his constitutional rights have been violated." *Jones v. Vacco*, 126 F.3d 408, 415 (2d Cir. 1997) (citing *Machado v. Commanding Officer*, 860 F.2d 542, 544 (2d Cir. 1988)). Unduly suggestive pre-trial identification procedures, standing alone, do not violate a defendant's constitutional rights. *See Brisco v. Ercole*, 565 F.3d 80, 89 (2d Cir. 2009) ("Even if an identification procedure is unduly suggestive, the out-of-court identification may nonetheless be admissible if other factors indicate that the identification is independently reliable."); (citing *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)).

Thus, even if Petitioner had demonstrated undue suggestiveness *and* lack of independent reliability at the *Wade* hearing, the most expansive remedy he could have received was preclusion of Witness Number 3's in-court identification. The functional

equivalent of preclusion occurred here, since Witness Number 3 did not testify at trial. Since the jury heard no identification testimony from Witness Number 3, Petitioner cannot state a due process claim. *See Manson*, 432 U.S. at 112 ("*Wade* and its companion cases reflect the concern that the jury not hear eyewitness testimony unless that evidence has aspects of reliability."). For all the foregoing reasons, the Court recommends denying relief on Ground Eleven.

## VIII.    Speedy Trial (Ground Fifteen)

Petitioner asserts that his Sixth Amendment and due process rights were violated as a result of the delay between the shooting on October 2, 2005, and the start of trial on September 11, 2007. (Dkt. No. 1 at 12 ¶ 22(O)). The Fourth Department summarily rejected this claim when he raised in his *pro se* supplemental appellate brief. *Smith*, 93 A.D.3d at 1346 (stating that "defendant's remaining contention in his *pro se* supplemental brief . . . is lacking in merit"). Respondent argues that the Fourth Department reasonably applied clearly established Supreme Court precedent in rejecting the speedy trial claim. (*See* Dkt. No. 37 at 55-62). The Court agrees and recommends dismissing Ground Fifteen.

The Sixth Amendment guarantee that all criminal defendants "shall enjoy the right to a speedy and public trial," U.S. Const. amend. VI, is "triggered by arrest, indictment, or other official accusation," *Doggett v. United States*, 505 U.S. 647, 655 (1992), or "by the unsealing of a sealed indictment," *United States v. Moreno*, 789 F.3d 72, 78 (2d Cir. 2015) (citing *United States v. Watson*, 599 F.2d 1149, 1156 (2d Cir. 1979)). There was no "official accusation" against Petitioner in connection with the Harris shooting until, at the latest, March 1, 2007, the date his indictment was unsealed. The period of time between

October 2, 2005, and March 1, 2007, represents pre-indictment delay, during which time Petitioner's Sixth Amendment speedy trial right had not yet attached. *See, e.g., United States v. Elsbery*, 602 F.2d 1054, 1058 (2d Cir. 1979) ("It is indisputable that the Sixth Amendment speedy trial right does not apply to pre-indictment delay."). Instead, claims of pre-indictment delay are based on due process principles. *Id.* at 1059 (citing *United States v. Lovasco*, 431 U.S. 783, 789 (1977)).

To establish a due process claim based on pre-indictment delay, Petitioner bears the burden of demonstrating that the delay "caused substantial prejudice to [his] rights to a fair trial and . . . was an intentional device to gain tactical advantage over the accused." *United States v. Marion*, 404 U.S. 307, 324 (1971). Petitioner has not adduced any facts suggesting that the RPD or the Monroe County District Attorney's Office intentionally delayed his prosecution to secure an advantage over the defense. His inability to show unjustifiable conduct by law enforcement or the prosecutor is fatal to his due process claim. *See Elsbery*, 602 F.2d at 1059 ("Under *Lovasco* and *Marion*, pre-indictment delay transgresses due process limits only when there is a showing of actual prejudice to the defendant's right to a fair trial [a]nd unjustifiable Government conduct.").

Even if he could show unjustifiable conduct, Petitioner he has failed to come forward with definite and non-speculative proof of prejudice. Petitioner argues that the delay allowed Gayden and Allen more time to concoct a story framing him for the shooting. (SR: 417). This is pure speculation, as Petitioner has not established that either Gayden or Allen fabricated their testimony. He also claims that the delay prejudiced his ability to assert an alibi because he experienced a "lack of memory as to where [he] was on the night in question." (*Id.*). The fact that "memories will dim, witnesses become

[in]accessible, and evidence be lost. . . are not in themselves enough to demonstrate that [a defendant] cannot receive a fair trial." *Marion*, 404 U.S. at 326.

Petitioner's assertion that he "lost" a witness who would have exonerated him (Beasley, Witness Number 3 at the *Wade* hearing), does not accurately reflect the record. Although Beasley did identify Gayden as the shooter during the initial photo array procedure, she later told Investigator May that Petitioner actually was the shooter. Beasley explained that she had not identified Petitioner earlier because she was afraid of retaliation. Petitioner by no means has established that Beasley was an exculpatory witness. Because Petitioner has not shown substantial, actual prejudice to his ability to defend himself as a result of the pre-indictment delay, his due process claim fails. *See United States v. Birney*, 686 F.2d 102, 106 (2d Cir. 1982) ("Without definite proof as to this essential element no due process claim has been stated.").

The claim of post-indictment delay in violation of the Sixth Amendment is governed by the four-factor test set forth in *Barker v. Wingo*, 407 U.S. 514 (1972). The relevant factors are: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his Sixth Amendment right, and (4) the prejudice to the defense from the delay. *Id.* at 521. The Court assumes that Petitioner has established "presumptively prejudicial" delay based on the time between official accusation and trial and will analyze the remaining *Barker* factors. *See United States v. Black*, 918 F.3d 243, 254 (2d Cir. 2019) ("The first factor, the length of delay, serves as a 'triggering mechanism' that places a speedy trial violation on the table and requires us to balance the other factors." (quoting *Barker*, 407 U.S. at 530)).

The second and fourth *Barker* factors—the reason for the delay and the prejudice to the defense—overlap with the factors relevant to the due process claim. As discussed above, the Court already has found that proof of either factor is absent on this record. And because Petitioner waited until after his conviction and sentence to assert his speedy trial rights, the third *Barker* factor likewise does not weigh in his favor. *See*, *e.g.*, *Garcia v. Annetts*, No. CIV. 9:08-CV-0736, 2011 WL 4810012, at *8 (N.D.N.Y. Sept. 1, 2011), *report and recommendation adopted*, No. 9:08-CV-0736 LEK/RFT, 2011 WL 4814913 (N.D.N.Y. Oct. 11, 2011) (finding that the petitioner's "failure to assert his speedy trial rights until after his trial was conducted weighs against a finding that his constitutional rights were violated"); *cf. United States ex rel. Eccleston v. Henderson*, 534 F. Supp. 813, 816 (E.D.N.Y. 1982) (finding that defendant, who filed a motion to dismiss the indictment based on delay nine months after arrest and nine and one-half months before trial did not assert speedy trial rights "aggressively enough to warrant [] relief" on Sixth Amendment claim). Because the Fourth Department's rejection of Petitioner's speedy trial claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, the Court recommends dismissing Ground Fifteen.

## VIII.  Consecutive Sentences (Ground Sixteen)

Petitioner asserts that the trial court violated his due process rights by imposing consecutive sentences. (Dkt. No. 1 at 12 ¶ 22(P)). As noted above, appellate counsel raised this claim on direct appeal, and the Fourth Department modified the judgment by ordering the sentences to run concurrently with each other. *Smith*, 93 A.D.3d at 1346. Respondent argues that Petitioner has already received all the relief to which he is entitled on his sentencing claim. (Dkt. No. 37 at 58). The Court agrees and, accordingly,

recommends dismissing this claim as moot. *See, e.g., Bomasuto v. Perlman*, 680 F. Supp. 2d 449. 457-58 (W.D.N.Y. 2010) (district court could not grant any effective relief, rendering habeas petition moot, where petitioner sought only specific performance of trial court's original sentence promise and he had already served his sentence).

## CONCLUSION

For the foregoing reasons, the Court recommends that Petitioner's request for a writ of habeas corpus be denied and that the petition (Dkt No. 1) be dismissed. The Court further recommends denying a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A) because Petitioner has failed to make a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2).

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby ORDERED that this Report, Recommendation and Order be filed with the Clerk of Court.

Unless otherwise ordered by Judge Sinatra, any objections to this Report, Recommendation and Order must be filed with the Clerk of Court within fourteen days of service of this Report, Recommendation and Order in accordance with the above statute; Rules 72(b), 6(a), and 6(d) of the Federal Rules of Civil Procedure; and Local Rule of Civil Procedure 72. Any requests for an extension of this deadline must be made to Judge Sinatra.

***Failure to file objections or to request an extension of time to file objections within fourteen days of service of this Report, Recommendation and Order WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.*** *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *See Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 990-91 (1st Cir. 1988).

Pursuant to Local Rule of Civil Procedure 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." ***Failure to comply with these provisions may result in the District Court's refusal to consider the objection.***

**SO ORDERED.**

Dated:      June 27, 2023
            Buffalo, New York

                                        MICHAEL J. ROEMER
                                        United States Magistrate Judge